**Neal RENDLEMAN, M.D., Plaintiff,**

**v.**

**Margaret HECKLER, Secretary of United States Department of Health and Human Services; Edward Martin, Director, Bureau of Health Care, Delivery and Assistance; James H. Daugherty, Director, Division of Health Services Scholarships, Bureau of Health Care, Delivery and Assistance, Department of Health and Human Services; Kenneth Moritsugu, Chief, National Health Services Corps., and United States of America, Defendants.**

Civ. No. 84–800–BE.

United States District Court,
D. Oregon.

Nov. 3, 1986.

Jonathan M. Hoffman, Martin, Bischoff, Templeton, Biggs & Ericsson, Portland, Or., for plaintiff.

Charles H. Turner, U.S. Atty., Jack G. Collins, Asst. U.S. Atty., Portland, Or., for Federal defendants.

SOLOMON, District Judge:

In this opinion, the following abbreviations are used:

| | |
|---|---|
| DHHS | —The United States Department of Health and Human Services |
| HMSA | — Health Manpower Shortage Area |
| DAB | — Data Analysis Branch |
| NHSC | — National Health Services Corps. |

### Background

Plaintiff filed this action for a declaration of his rights and obligations under a scholarship contract with the National Health Scholarship Committee of the United States Department of Health and Human Services (DHHS).

In 1978, plaintiff, who was then a medical student, applied for and received a scholarship with the National Health Services Corps. The scholarship program in which plaintiff participated was designed to encourage scholarship recipients to serve in rural areas and in inner cities to correct the geographic maldistribution of health care. The designated areas included geographic areas with health care shortages termed Health Manpower Shortage Areas (HMSA's). Once an HMSA was designated, DHHS placed scholarship recipients in these areas to rectify the shortage problem. The scholarship contract required recipients to serve one year as physicians for every year of assistance they received.

The tasks of assigning scholarship recipients to specific locations and designating HMSA's are carried out by two different agencies within DHHS. The Data Analysis Branch (DAB) identifies HMSA's, and the Bureau of Health Care, Delivery and Assistance assigns scholarship recipients to them. In assessing whether an area qualifies as an HMSA, the DAB relies primarily on the resident/physician ratio of the area. One major reason for separating these two functions between different branches is to limit decisions on whether an area is designated as an HMSA to the technical assessment of the resident/physician ratio. The average national resident/physician ratio is 641 to 1. To qualify as an HMSA, the ratio must exceed 3,000 to 1. The normal high priority HMSA seldom exceeds a ratio of 5,000 to 1.

While a member of the public "may recommend" designation of an area or population group, the Secretary decides what areas to designate, 42 U.S.C. § 254e(d), and must review and revise the list of HMSA's annually, 42 U.S.C. § 254c(d); 42 C.F.R. § 5.3(a). When analyzing particular sites for HMSA designation, the DAB has an inner office policy of completing its reviews within sixty days.

Under the NHSC scholarship contract, the plaintiff agreed to serve "in a full-time clinical practice ... in a health manpower shortage area designated under Section 332 of the Public Health Service Act to which [he was] assigned...." No other provision in the contract explains how a scholarship recipient is placed in a particular area.

When plaintiff was considering his application for an NHSC scholarship, he was given several recruitment brochures. One brochure stated that:

Primary care shortage areas—areas with more than 3,500 residents per primary care physician—can be found in all 50 states, the District of Columbia, and other U.S. possessions. By 1981, the Corps expects there will be some 2,000 areas with shortages of primary medical manpower. Of these, about 500 will be in urban areas....

Your placement location will be determined by taking into account your geographic and specialty preferences and

the needs of the National Health Service Corps. Although the Corps makes the final decision on your placement, the Corps makes every effort to meet your placement wishes, especially when your desired location is one in which you would most probably remain after your service obligation is completed.

Another brochure stated that scholarship recipients could "choose the geographical location" in which they would serve. In addition to reading these brochures, plaintiff attended talks given by NHSC scholarship recruiters. One of the speakers stated that DHHS would help scholarship recipients develop HMSA site clinics.

Unlike the brochures, the regulations do not provide that the recipient's preference of location will be considered in assigning a recipient to a particular location. But, the regulations do provide that:

> In making the assignment of a Corps member to an entity in a health manpower shortage area, ... the Secretary shall seek to assign to an area a Corps member who has (and whose spouse, if any, has) those characteristics which are characteristics which increase the probability of the member's remaining to serve the area upon completion of his assignment period.

42 U.S.C. § 254f(e).

### Facts

Plaintiff applied for his NHSC scholarship in 1978. He graduated from medical school in 1981 and applied for three consecutive one-year deferrments to allow him to fulfill his internship and residency requirements. Plaintiff completed his internship and his first year of residency. Without completing his second year of residency, he resigned to develop a clinic for the Burnside Community Council to serve the homeless and poor living in the vicinity of the Burnside Bridge. Plaintiff's wife, also an NHSC scholarship recipient, was already fulfilling her NHSC contract practicing within a clinic in Cornelius, Oregon. Before plaintiff opened his clinic called the "Eastside Community Clinic," the DAB in-

formed plaintiff that most of the area served by the clinic in North and Northeast Portland was a designated HMSA. On the basis of the literature he received, the statements of the scholarship recruiter, and other statements of DHHS personnel, plaintiff assumed that DHHS would cooperate in his placement at the Eastside Community Clinic and would assist in its development.

Beginning in August, 1983, plaintiff treated patients at Eastside Community Clinic. The response was overwhelming. Plaintiff immediately began to treat seventy-five patients a week. Within a short period, plaintiff had a total caseload of over a thousand patients.

Shortly thereafter, plaintiff requested the regional NHSC recruiter to help make the clinic a federal-hire site so that plaintiff could be placed on the federal payroll and get support monies for the clinic's operation. The regional recruiter informed plaintiff that the clinic was not in a designated HMSA and refused his request for assistance.

Plaintiff was subsequently informed by the NHSC state contractor and by the Multnomah County Health Department that the ECC was in an area contiguous to an HMSA and served an 80% poverty population. Based on this information and his view of the overwhelming need for the clinic, plaintiff continued to request assistance from DHHS to have this area designated as an HMSA. He was unsuccessful.

. Although DHHS stated that it reviewed the area for designation, it is doubtful whether this review was seriously undertaken. A regional NHSC representative wrote to the national office saying that because of plaintiff's adamant desire to serve only the Burnside area, they were "reluctant to give any favorable consideration" to his HMSA designation request.

Although DHHS in 1983 insisted that plaintiff's clinic was not located in an HMSA, it did not declare him to be in default on his contract. Instead, DHHS assigned him for placement in the summer of 1984 and ultimately assigned him to a

site in Alabama. In July, 1984, when plaintiff refused to go to the assigned Alabama site, he was declared in default.

Although the Secretary declared plaintiff to be in default, plaintiff continued to work at his Burnside clinic and continued to seek HMSA designation. In October, 1984, the Burnside Community Council formally requested HMSA designation for the Eastside Community Clinic. After reviewing the request, the DAB concluded approval was appropriate. Nevertheless, in an unusual deviation from its established policy, the Data Analysis Branch requested the Bureau of Health, Delivery and Assistance to comment on the North Portland HMSA request. The DAB neither approved nor disapproved the request. Instead, in February, 1985, the DAB requested and received more information from the Burnside Community Council. In July, 1985, the DAB denied the Council's request. In response, the Burnside Community Council and the State of Oregon sent the DAB more information.

About five months later, the DAB determined that it had erred and that the North Portland area was a qualified HMSA. The resident/physician ratio in fact was determined to be 9,205 to 1.

### Discussion

Plaintiff filed this action for declaratory and injunctive relief to declare his rights and obligations under the NHSC contract. The parties have filed cross-motions for summary judgment. The principle issue is whether plaintiff breached his NHSC contract with DHHS by refusing to serve at his assigned HMSA site in Alabama.

The Secretary argues that under the Act she has the authority to assign NHSC scholarship recipients to HMSA locations. The Secretary contends that because plaintiff did not go to his assigned HMSA in Alabama, he has defaulted on his contract. The Secretary asserts that plaintiff's service for more than three years in an area recently designated as an HMSA is irrelevant. She asserts that her department did not assign plaintiff to that area, and that in addition, it was not a designated HMSA when plaintiff first started there. Plaintiff asserts that even if the HMSA in which he now serves was not designated until December, 1985, it has qualified as an HMSA since 1980, and the Secretary acted capriciously when she denied him the opportunity to remain at the Eastside Community Clinic which had a resident/physician ratio twice as high as the highest HMSA priority level in the DHHS guidelines.

The regulations cited by the Secretary support her argument that she has the authority to assign scholarship recipients to specific HMSA locations. The Secretary is responsible for matching several hundred doctors each year to HMSA sites around the country. To permit the recipients rather than the Secretary to determine the areas in which the recipients shall serve would significantly interfere with the Secretary's ability to conduct the NHSC program.

But the Secretary does have some reciprocal obligations. The Secretary has an obligation to carry out the NHSC scholarship program consistent with the regulations and with the representations in her recruitment brochures. She must work in a cooperative spirit with program participants in at least three areas. First, in assigning participants to an area, she must give at least some consideration for their preferred location. Second, if a program participant requests an HMSA designation, the Secretary has an obligation to review that request in an appropriate manner. 42 U.S.C. § 254e(d). Finally, if the Secretary is aware of a community deserving of HMSA designation, she has an obligation to work for, and not against, that community's health manpower needs.

Here, the evidence shows that the regional staff was unhappy with plaintiff because of his independent personality, and that rather than work with him in determining whether the Burnside area qualified as an HMSA and in developing a clinic, DHHS worked against him, even though this area was not only a proper area for HMSA designation, but a crisis area which needed this clinic. DHHS erred in allowing personal animosity and hostility to influence

its decision to assign plaintiff to Alabama rather than grant his request to be assigned to Oregon where his services were needed and where his wife resided and intended to stay.

The evidence shows that the area within the vicinity of the clinic has qualified as an HMSA since 1980. The DAB figures indicate that this area has a poverty population with a resident/physician ratio of almost twice the highest priority HMSA designation level listed in the DHHS guidelines. Even with the services rendered by plaintiff and his wife, the area has a resident/physician ratio of 3,575 to 1, which still exceeds the HMSA designation level.

Plaintiff technically violated some provision of his contract, but if DHHS had not erred in assessing the HMSA status of the Burnside area, and had DHHS made a good faith effort to work with, rather than against plaintiff, I find that plaintiff would have been assigned to the Eastside Community Clinic before the date on which he was declared in default.

On the basis of the facts in this case, I hold that plaintiff's service at the Eastside Community Clinic for the past three years and three months fulfilled his NHSC contract, and plaintiff is entitled to judgment in his favor.