860 F.2d 1537
 50 Ed. Law Rep. 57
 Neal RENDLEMAN, M.D., Plaintiff-Appellee,
v.
Otis R. BOWEN, M.D., Secretary of the United States
Department of Health and Human Services; Edward F. Martin,
Director, Bureau of Health Care Delivery and Assistance;
James H. Daugherty, Director, Division of Health Services
Scholarships, Bureau of Health Care Delivery and Assistance;
Kenneth Moritsugu, Chief, National Health Services Corps;
Defendants-Appellants,
and
United States of America, Defendant-Intervenor-Appellant.
 No. 87-3568.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 7, 1988.
Decided Nov. 16, 1988.
 
 John F. Daly, Asst. U.S. Atty., Civil Div., Washington, D.C., for defendants-appellants.
 Jonathan M. Hoffman and Stephanie L. Striffler, Martin, Bischoff, Templeton, Ericsson & Langslet, Portland, Or., for plaintiff-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before WALLACE,* SKOPIL and HALL, Circuit Judges.
 Cynthia Holcomb HALL, Circuit Judge:
 
 
 1
 Defendants-appellants Otis R. Bowen, Secretary of Health and Human Services, et al., appeal from the district court's grant of summary judgment in favor of plaintiff-appellee Dr. Neal Rendleman. The district court exercised jurisdiction pursuant to 28 U.S.C. Sec. 1331. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. We reverse and remand the case to the district court for further proceedings.
 
 
 2
 * Rendleman is a participant in the National Health Service Corps ("NHSC") Scholarship Program, established by Congress in 1976 to address the maldistribution of health care manpower in the United States. See Pub.L. No. 94-484, 90 Stat. 2270 (1976) (codified as amended at 42 U.S.C. Secs. 254d-254r). Under the program, eligible students in professional health degree programs receive scholarships that cover their educational expenses and include a stipend for living expenses. 42 U.S.C. Sec. 254l (g). In return, the student agrees to serve "in a health manpower shortage area (designated under section 245e of this title) to which he is assigned by the Secretary...." Id. at Sec. 254l (f)(1)(B)(iv). The student's "period of obligated service" is equal to one year for each year the student receives a scholarship, or a minimum of two years, whichever is greater. Id. This service obligation may be met in a number of ways: (1) as a commissioned officer in the Public Health Service ("PHS")[1] or a civilian employee of the NHSC, id. at Sec. 254m; (2) in private practice in a health manpower shortage area (referred to as the "private practice option"), id. at 254n; or (3) as an employee of a non-federal entity such as a state-run community clinic (known as a "private practice assignment"), id. at Sec. 254m.
 
 
 3
 Every student must submit with his or her scholarship application a signed written contract agreeing to accept payment of the scholarship and to serve for his or her period of obligated service in a health manpower shortage area ("HMSA"). 42 U.S.C. Sec. 254l (b)(4). The exact terms to be included in the contract are specified in the statute. Id. at Sec. 254l (f).
 
 
 4
 The law directs the Secretary of Health and Human Services ("Secretary") to assign "individuals performing obligated service in accordance with a written contract under the Scholarship Program to health manpower shortage areas...." 42 U.S.C. Sec. 254m(d). An HMSA may consist of a geographical region, a specified population group within an area, or a particular medical facility. Id. at Sec. 254e(a). Under the statute, the task of designating HMSAs is for the Secretary, although Congress requires that the Secretary consider numerous factors in determining whether an area should be designated as an HMSA. Id. at Sec. 254e. The law further provides that "[a]ny person may recommend to the Secretary the designation of an area, population group, medical facility, or other public facility as a health manpower shortage area." Id. at Sec. 254e(g).
 
 
 5
 Although Congress enacted criteria for the assignment of corps personnel, 42 U.S.C. Sec. 254f, the law provides little guidance on the assignment of non-corps personnel. The Secretary, however, has implemented a mandatory placement process to match scholarship recipients and high priority HMSAs. Approximately one year prior to the time when the scholarship recipients will begin their obligated service, the Secretary informs the recipients of the assignment process and of the available HMSA locations. Those locations are listed on the agency's HMSA Placement Opportunity List ("HPOL"). The list includes federal-hire and private practice assignments, as well as locations where private practice options will be allowed. All scholarship recipients must submit a "Site Selection Questionnaire," which requests information about the recipient's specialty, home state, spouse's home state, spouse's employment, and personal hardships. Scholarship recipients, through the "Early Decision Alternative," have until September 30 to apply for any HMSA location included on the HPOL. Thereafter, scholarship recipients are assigned to PHS regions based upon how the recipient ranked on the questionnaire in comparison with the other recipients in the same specialty. Recipients assigned to a particular region must locate a position within the region by April of the following year or they are assigned to a site by the NHSC.
 
 
 6
 Rendleman applied for and received an NHSC scholarship in 1978. Rendleman v. Heckler, 653 F.Supp. 316, 317 (D.Or.1986). In deciding whether to apply for the scholarship, plaintiff read the NHSC's recruitment brochures. Id. Those pamphlets stated that assignments
 
 
 7
 are determined by taking into account the specialty training and geographical preferences of the recipient and spouse, as well as the needs of the National Health Service Corps. The Corps will make every effort to meet placement wishes, especially where the desired location is one in which the recipient would most probably remain after the service obligation was completed. However, due to the serious nationwide needs that must be met, the Corps reserves the right to make the final decision on placement.
 
 
 8
 As required by the law, Rendleman submitted a signed contract with his application in which he agreed to serve "in a health manpower shortage area ... to which the applicant is assigned...." He renewed his agreement the following year in order to obtain a further scholarship award. The total amount received by Rendleman under the scholarship program was $31,995.12.
 
 
 9
 Upon his graduation from medical school in 1981, Rendleman received three one-year deferments of his service obligation in order to complete his training in a residency program. Rendleman, 653 F.Supp. at 318. The deferments prohibited any changes "in the period or type of training without prior approval from the Scholarship Program." Nevertheless, in June 1983, after submitting his deferment application for the period July 1, 1983 through June 30, 1984, Rendleman dropped out of his residency program without the prior approval of the NHSC.
 
 
 10
 In August 1983, Rendleman informed PHS personnel by telephone of his withdrawal from the residency program and his opening of the East Side Community Clinic in North Portland, Oregon. He subsequently wrote the PHS on September 26, 1983 to give "formal notification of my fulfillment of my NHSC obligation at this setting." Although at that time a portion of North Portland was designated as an HMSA, the clinic was not located within that area. Robert Epstein, a recruiter for NHSC, sent Rendleman a reply letter dated October 3, 1983, informing plaintiff that working at the clinic would not fulfill his NHSC scholarship obligation because the clinic was not located in an HMSA and the site was not on the HPOL. A series of letters were exchanged between the parties over the next several months, and Rendleman was continually informed that the clinic was not located in an HMSA.
 
 
 11
 In a letter dated February 6, 1984, a recruiter for the NHSC informed an NHSC employee who was handling Rendleman's situation that all of the 1984 placements in Oregon were filled. The letter further stated that Rendleman's spouse, who was currently fulfilling her NHSC scholarship service in Oregon, would be rotating out of her position in the summer. The recruiter noted that "[t]his certainly raises the question of his needing to be in the Portland area. Also, he has continually ignored the Central Office placement guidelines as well as the verbal and written guidelines given by this office.... As a result, I am very reluctant to give him any favorable consideration."
 
 
 12
 Shortly thereafter, in letters dated February 14, 1984 and February 23, 1984, officials of the PHS and NHSC advised Rendleman that the situation in North Portland had been reviewed and it was determined that the community where the clinic was located was not designatable as an HMSA. A new application was submitted in October 1984 by the organization that operated the East Side Community Clinic, the Burnside Community Council ("BCC"), seeking designation of the poverty population of Multnomah County, Oregon as an HMSA.[2] This application was rejected by the Secretary in June 1985. Upon the submission of further information, the Secretary approved, in November 1985, the HMSA designation of two census tracts for the North Portland area which included the clinic. This area, however, had never before been considered by the Secretary and differed from the request rejected by the Secretary in June 1985.
 
 
 13
 As the result of Rendleman's decision to cease his residency and failure to begin any approved service, the PHS regional staff recommended in February 1984 that he be placed in default. However, the director of the PHS Bureau of Health Care Delivery and Assistance overruled the request and decided to allow Rendleman to remain in the HMSA placement process for the 1983-84 placement cycle.
 
 
 14
 Because Rendleman failed to obtain a position in an HMSA during the "Early Decision Alternative" period, and because no openings were available in the NHSC Region X (Oregon, Washington, Idaho, and Alaska), the NHSC assigned Rendleman in April 1984 to the State of Alabama. When Rendleman failed to obtain a position within an HMSA in Alabama, the Secretary placed him in a private practice assignment in Evergreen, Alabama. Rendleman refused to accept the assignment and was declared in default on August 1, 1984, shortly after this action was filed.
 
 
 15
 Rendleman brought this suit seeking a declaratory judgment that he is not in default on his obligation and that the area where the East Side Community Clinic is located is an HMSA. Defendants counterclaimed for triple damages as provided for by the statute and the written contract signed by Rendleman. The parties filed cross-motions for summary judgment and the district court ruled in favor of Rendleman. The district court held that although the Secretary is responsible for assigning scholarship recipients to HMSA sites, the Secretary "must work in a cooperative spirit with program participants...." Rendleman, 653 F.Supp. at 319. The court found that the regional staff "was unhappy with plaintiff" and that they "worked against him" by refusing to designate the area where the clinic was located as an HMSA, even though it had "qualified as an HMSA since 1980." Id. at 319-20. The court concluded that the plaintiff would have been assigned to the East Side Community Clinic if the Secretary had "made a good faith effort to work with, rather than against plaintiff." Id. at 320.
 
 II
 
 16
 We review the grant of summary judgment de novo. Wellman v. International Union of Operating Engineers, 812 F.2d 1204, 1205 (9th Cir.1987).
 
 
 17
 The NHSC Scholarship Program is designed to improve the delivery of medical services in health manpower shortage areas. The program is not intended "as a mechanism solely to subsidize health professional education," but "as a means to overcome a geographic maldistribution of health professionals." S.Rep. No. 94-887, 94th Cong., 1st Sess. 201 (1975). Towards this end, Congress specifically required that to be eligible for the program the student must agree to serve "for the applicable period of obligated service in a health manpower shortage area." 42 U.S.C. Sec. 254l (b)(4).
 
 
 18
 In passing the statute, Congress intended to implement certain public policy goals by conditioning receipt of scholarship aid upon compliance by the recipient with federal statutory and administrative directives. These conditions do not arise from a negotiated agreement between the parties; rather, they are provided for in the statute. Statutory intent, therefore, is more relevant to the interpretation of these conditions than are common law contract principles. American Hosp. Ass'n v. Schweiker, 721 F.2d 170, 183 (7th Cir.1983), cert. denied, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984).
 
 
 19
 In addition, the plain language of the statute demonstrates that Congress did not intend that contract principles govern the interpretation of the relationship between the Secretary and a scholarship recipient. See, e.g., United States v. Locke, 471 U.S. 84, 95-96, 105 S.Ct. 1785, 1792-94, 85 L.Ed.2d 64 (1985) ("deference to the supremacy of the Legislature ... generally requires us to assume that 'the legislative purpose is expressed by the ordinary meaning of the words used.' " (citation omitted)). The only terms contained in the written agreement signed by a recipient are those required by the statute--that the recipient agrees to accept the aid, that upon completion of the educational program the recipient will serve in an HMSA, and that the recipient will pay triple damages if found in default on the obligation. 42 U.S.C. Sec. 254l (f). Other conditions that affect scholarship recipients' service, such as the designation of HMSAs, are not included in the contract, although Congress addressed those issues in the statute. Thus, the obligations of the Secretary are to be based on statutory and not contractual principles. See, e.g., Hahn v. United States, 757 F.2d 581, 590 n. 8 (3d Cir.1985); Aiken v. United States, 4 Cl.Ct. 685, 692 (1984); United States v. Turner, 660 F.Supp. 1323, 1328-29 (E.D.N.Y.1987); Fisher v. Bowen, 659 F.Supp. 784, 786 n. 1 (D.Or.1987). See also American Hosp. Ass'n, 721 F.2d at 182-83.[3]
 
 
 20
 The Secretary declared Rendleman in default after he failed to accept an assignment to an HMSA in Alabama. Rendleman contends, however, that his work at the East Side Community Clinic satisfies his service obligation because it is located in an area that qualifies as an HMSA.
 
 
 21
 As noted above, Congress explicitly requires that scholarship recipients fulfill their service obligations in an HMSA. 42 U.S.C. Sec. 254l (f)(1)(B)(iv). At the time that Rendleman dropped out of his residency program, the area where the clinic was located was not designated as an HMSA, and Rendleman was so informed. Moreover, the designation of the census tract that included the clinic did not occur until well after Rendleman was declared in default. Thus, Rendleman's refusal to commence his service in a designated HMSA justifiably resulted in the Secretary's decision to find him in default.[4]
 
 
 22
 Nevertheless, Rendleman claims that the Secretary had a duty to designate the area encompassing the clinic as an HMSA before plaintiff began his service. This argument fails for several reasons.
 
 
 23
 First, while the area where the clinic was located was declared an HMSA in 1985 and apparently qualified as an HMSA when Rendleman requested his placement at the clinic, the Secretary is not required to postpone the assignment of a scholarship recipient simply because the area where the recipient seeks to serve might later be designated as an HMSA. Under Rendleman's construction of the statute, a scholarship recipient who located in an area not designated as an HMSA could not be found in default until the Secretary undertook a comprehensive review of the location to determine whether it qualified as an HMSA. Nothing in the statute suggests that Congress endorsed such a system, and the plain language of the statute requiring the assignment of scholarship recipients to an HMSA demonstrates otherwise. See, e.g., United States v. Locke, 471 U.S. 84, 95-96, 105 S.Ct. 1785, 1792-94, 85 L.Ed.2d 64 (1981) (courts must reject statutory constructions contrary to "clear import of Congress' chosen words").
 
 
 24
 Second, even if the Secretary had designated the area where the clinic was located as an HMSA, that would not have guaranteed Rendleman a placement at the clinic. Although every attempt is made to assign scholarship recipients to an HMSA in the location of their choice, some regions are substantially more popular than others. The very purpose of this Congressional program is to have new health care professionals deliver medical services to areas suffering shortages of medical personnel. Thus, the Secretary must locate some recipients in less desirable areas. Congress has plainly given the Secretary the authority and discretion to make a final determination on the placement of scholarship recipients. See, e.g., United States v. Fowler, 659 F.Supp. 624, 625 (N.D.Cal.1987), aff'd, 849 F.2d 1476 (9th Cir.1988); United States v. Redovan, 656 F.Supp. 121, 125 (E.D.Pa.1986), aff'd, 826 F.2d 1057 (3d Cir.1987); Mattis v. United States, 648 F.Supp. 137, 140 (E.D.Wis.1986); United States v. Brooks, 643 F.Supp. 256, 259 (E.D.Mich.1986); United States v. Swanson, 618 F.Supp. 1231, 1239-40 (E.D.Mich.1985).
 
 
 25
 Finally, consistent with the Congressional goal of delivering health care to areas suffering shortages of medical personnel, the Secretary identifies those HMSAs with the greatest need for health care professionals and places them on the HPOL.[5] As a result, to fulfill their service obligation, scholarship recipients must not merely serve in an HMSA, but in an HMSA listed on the HPOL. Thus, even if the Secretary had designated the area where the clinic was located as an HMSA prior to Rendleman's default, that the location was not listed on the HPOL precluded Rendleman's service in the area from satisfying his scholarship obligations.
 
 III
 
 26
 In assigning Rendleman to an HMSA in Evergreen, Alabama, the record demonstrates that the Secretary properly followed the statute and regulations. While the site was not in a region that Rendleman desired, he was given the opportunity to participate in the placement program and the assignment was issued only after Rendleman failed to locate in an HMSA prior to April 1984. Rendleman argues, however, that recruitment brochures produced by the Secretary and given to potential applicants, including him, indicated that the Secretary would make every effort to place program participants in the locations they desired. According to Rendleman, agency employees allowed their personal animosity towards him to influence the decision to place him in Alabama.
 
 
 27
 The only evidence in the record of such a "hostile attitude" is a February 6, 1984 letter from an NHSC recruiter to another NHSC employee. The language relied upon by Rendleman is the conclusion by the recruiter that she is "very reluctant to give [Rendleman] any favorable consideration" because Rendleman "continually ignored the Central Office placement guidance as well as the verbal and written guidance given by this office, in order to proceed with his plans at the Burnside Clinic." Yet, that very same letter indicates that the agency was attempting to satisfy Rendleman and locate a position for him in Oregon, but that all the positions were filled. The letter further states that Rendleman's alleged need for placement in Oregon was no longer evident because his spouse would be rotating out of her position in the summer.[6] Thus, the district court's finding that the agency allowed "personal animosity and hostility to influence its decision to assign plaintiff to Alabama" is not supported by the record.[7]
 
 
 28
 In addition, Rendleman's reliance on the recruitment brochures issued by the Secretary is misplaced. While the pamphlets state that "[t]he Corps will make every effort to meet placement wishes," they clearly explain that "due to the serious nationwide needs that must be met, the Corps reserves the right to make the final decision on placement." The current system employed by the Secretary for matching scholarship recipients to HMSA locations attempts to place participants in the locations of their choice. As indicated above, the February 6, 1984 letter demonstrates that the agency attempted to place plaintiff in Oregon, but that no positions were available. Rendleman was given the opportunity to participate in the placement program and his assignment to Alabama was issued only after he elected to remain in a location not designated as an HMSA. Thus, the record demonstrates that the Secretary complied with his statutory and administrative obligations.
 
 IV
 
 29
 We hold that the district court erred in granting Rendleman's motion for summary judgment and direct the district court to enter summary judgment in favor of defendants on the issue of Rendleman's default. The district court did not consider the defendants' counterclaim on the issue of the statutory triple payback provision, 42 U.S.C. Sec. 254o (b)(1). Our opinion does not foreclose consideration of a remand by the district court to the agency for its limited consideration of a waiver of Rendleman's obligations pursuant to section 254o (c)(3).[8]
 
 
 30
 The judgment of the district court is REVERSED, the award of court costs and expenses to the plaintiff is VACATED, and the case is REMANDED for further proceedings.
 
 SKOPIL, Circuit Judge, concurring:
 
 31
 I concur in the court's decision. I write separately only to express my opinion that this case should be remanded to the agency for its limited consideration of a waiver pursuant to section 254o (c)(3).
 
 
 32
 We properly conclude that Rendleman breached his contract. We also note, however, that he established a medical clinic in a poverty area of Portland that was eventually designated as an HMSA. This circumstance apparently led the district court to conclude that Rendleman's service at the Eastside Community Clinic, although technically not in compliance with the NHSC contract, nevertheless fulfilled Rendleman's obligations under the Act. Rendleman v. Heckler, 653 F.Supp. 316, 320 (D.Or.1986).
 
 
 33
 The record does not indicate that the agency has considered crediting Rendleman with his service at the Eastside Community Clinic by waiving all or part of his obligation. I would include in our remand order a direction to the district court to return this case to the agency for that limited determination.
 
 
 
 *
 Judge Wallace was selected to replace Judge O'Scannlain, who recused himself prior to oral argument. Judge Wallace has read the briefs, reviewed the record, and listened to the tape of oral argument
 
 
 [1]
 The PHS is a division of the Department of Health and Human Services and is administered by the Surgeon General under the supervision and direction of the Secretary of Health and Human Services. 42 U.S.C. Sec. 202. The NHSC is a branch of the PHS. 42 U.S.C. Sec. 254d
 
 
 [2]
 Multnomah County includes the North Portland area that the East Side Community Clinic serves
 
 
 [3]
 When undertaking such a statutory program, the government may "alter the expectations and obligations of private parties." Schweiker, 721 F.2d at 183 (citing FHA v. The Darlington, Inc., 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); Thorpe v. Housing Authority of the City of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969); Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976))
 
 
 [4]
 That plaintiff sought to serve at the clinic through the "private practice option" does not alter this analysis because such service must occur in an HMSA. 42 U.S.C. Sec. 254n(a)
 
 
 [5]
 The creation of an HPOL, although not expressly provided for by Congress, is simply a means of implementing the scholarship program within the authority that Congress has given the Secretary. The HPOL allows the Secretary a means for assigning health care professionals to those areas where they are most needed. The HPOL for the year 1983 listed several hundred locations, with positions in 49 states, the District of Columbia, Puerto Rico, and United States Territories
 
 
 [6]
 In fact, in notifying Rendleman of his assignment to Evergreen, Alabama, the agency advised him that a position was available for his wife in an area nearby
 
 
 [7]
 By itself, that single statement in the letter, purporting to show a "hostile attitude," is not sufficient evidence for a jury to return a verdict in Rendleman's favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11, 91 L.Ed.2d 202 (1986)
 
 
 [8]
 Although we disagree with the district court that Rendleman's service at the Eastside Community Clinic fulfilled his NHSC contract obligations, the district court may consider whether his service in establishing a medical clinic in a poverty area, or the financial resources available to Rendleman as a result of such service, is sufficient for the agency to consider whether to credit Rendleman with his time at the Eastside Community Clinic, grant a waiver of all or part of his obligation as a result of his prior service, or otherwise not subject Rendleman to the full damage provisions provided by section 254o (b)(1). See 42 C.F.R. Sec. 62.12(d)