**Theresa Y. MANGUAL, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 566–88.

United States Court of Federal Claims.

Jan. 27, 1993.

Eduardo Peña, Jr., Washington, DC, for plaintiff.

Thomas W. Petersen, Washington, DC, with whom was Asst. Atty. Gen., Stuart M. Gerson, and David M. Cohen for defendant. Robin M. Lee, Dept. of Health and Human Services, of counsel.

## ORDER

MOODY R. TIDWELL, III, Judge:

This action is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction, and the parties' cross-motions for summary judgment. For the reasons set forth below, the court grants in part and denies in part defendant's motion to dismiss, denies plaintiff's motion for summary judgment, and grants, in part, defendant's motion for summary judgment.

## FACTS

In 1978, while a medical student at the University of Puerto Rico, plaintiff applied for and received a scholarship under the National Health Service Corps (NHSC) Scholarship Program. The Scholarship Program was established by section 751 of the Public Health Service Act, currently codified at 42 U.S.C. § 254l–254t.[1] As required by statute, 42 U.S.C. § 294t (current version at 42 U.S.C. § 254l (1988 & Supp. II 1990)), on June 20, 1978, she signed a scholarship agreement with the Secretary of the Department of Health, Education and Welfare (now Department of Health and Human Services) (Secretary). She later renewed her agreement, first on March 27, 1979, and again on May 18, 1980, by executing extensions in order to obtain further scholarship awards. A representative of the Secretary countersigned all three documents. These documents set out the obligations of the scholarship recipient and the Secretary.

The relevant portions of plaintiff's scholarship agreement read as follows:

### NATIONAL HEALTH SERVICE CORPS SCHOLARSHIP PROGRAM CONTRACT

Section 751 of the Public Health Service Act (42 U.S.C. 294t) establishes the National Health Service Corps Scholarship Program ("Scholarship Program") and authorizes the Secretary of Health, Education, and Welfare ("Secretary") to provide applicants selected to be participants in the Scholarship Program with scholarship awards. In return for awards, applicants must agree to perform a period of obligated service as members of the National Health Service Corps (autho-

---

**1.** The court finds it unnecessary to set out the history, purposes, and general procedures of the NHSC Scholarship Program as other courts have already done so. *See, e.g., United States v.* *Duffy,* 879 F.2d 192, 193–194 (6th Cir.1989); *Rendleman v. Bowen,* 860 F.2d 1537, 1539 (9th Cir.1988); *Hahn v. United States,* 757 F.2d 581, 583 (3rd Cir.1985).

rized under Section 331 of the Public Health Service Act, 42 U.S.C. 254d) in the health manpower shortage areas designated under Section 332 of the Public Health Service Act (42 U.S.C. 254e) or in those units of the Department of Health, Education, and Welfare to which they may be assigned.

. . . .

**Section A**—Obligations of the Secretary
. . . the Secretary agrees to:

1. Provide the undersigned applicant ("applicant") with a scholarship award for the school year 1978–79 during which the applicant:

a. is enrolled . . . as a full-time student in an accredited . . . educational institution in . . . the Commonwealth of Puerto Rico, . . . and

b. is pursuing a course of study leading to a degree in medicine. . . .

The scholarship award consists of tuition, an amount for all other reasonable educational expenses incurred by the student, and a monthly stipend for the 12–month period beginning with the first month of each school year in which the applicant is a participant in the Scholarship Program.

2. Accept the applicant into the Corps or other unit of the Department of Health, Education, and Welfare, as provided in section B(4) of the contract.

3. Defer performance of the period of obligated service for applicants who receive a degree in medicine. . . .

**Section B**—Obligations of the Applicant
The applicant agrees to:

1. Accept the scholarship award provided by the Secretary under section A(1) of this contract for the school year 1978–79.

. . . .

4. Serve in the full-time clinical practice of his or her profession (a) as a commissioned officer in the Regular or Reserve Corps of the Public Health Service or as a civilian member of the Corps in a health manpower shortage area designated under Section 332 of the Public Health

Service Act to which the applicant is assigned, . . . .

5. Serve one year of obligated service for each year the scholarship award is provided, or two years, whichever is greater.

**Section C**—Breach of Scholarship Contract

If the applicant:

. . . .

3. Fails to begin or complete the period of obligated service incurred under this contract . . . the United States shall be entitled to recover an amount equal to three times the scholarship funds awarded, plus interest, as determined by . . . formula. . . .

The amount the United States is entitled to recover shall be paid within one year of the date the Secretary determines that the applicant has failed to begin or complete the period of obligated service.

The first extension to plaintiff's scholarship agreement reads as follows:

Extension and Amendment of 1978–79

National Health Service Corps

Scholarship Program Contract

Consistent with Section B of the 1978–79 National Health Service Corps Scholarship Program ("Scholarship Program") Contract entered into between the undersigned recipient ("recipient") and the Secretary of Health, Education, and Welfare, this document extends that contract by awarding the recipient a continuation scholarship award for the 1979–80 school year. . . .

In addition, this continuation award for the 1979–80 school year amends the recipient's 1978–79 Scholarship Program Contract in that, in accepting this award, the recipient agrees not only to comply with the obligations imposed under the 1978–79 Scholarship Program Contract and section 751 of the Public Health Service Act (42 U.S.C. 294t), but also those obligations imposed under the regulations implementing the Scholarship Program in 42 CFR Part 62.

The second extension to plaintiff's agreement reads similarly.

In return for the scholarship aid received [2], plaintiff agreed to provide a total of three years of service as a member of the NHSC in a designated health manpower shortage area (HMSA) or in a designated unit of HEW. *See* Section B(4) of the Contract. The parties' dispute arises out of this provision of the written agreement.

Following plaintiff's graduation from medical school in June 1981, she received a four-year deferment of her service obligation in order to undertake residential training in obstetrics and gynecology. Plaintiff completed her residency in June 1985.

In 1981, subsequent to the last extension of plaintiff's written agreement with the NHSC but prior to the date on which she was to begin providing service, Congress amended the Public Health Service Act, by enacting Public Law 97–35. Pursuant to these amendments, Congress gave the Secretary the power to assign scholarship recipients to render their service obligation as non-federal employees under the private practice assignment program. *See* 42 U.S.C. §§ 254d(a)(1)(C), 254f (1982).

In July 1984, almost one year prior to completion of her residency, plaintiff received a packet of information from the NHSC, including a list of vacant positions (the HMSA Placement Opportunity List or HPOL) in which she could fulfill her service obligation. The material informed her that she could fulfill her service obligation either as a federally-employed member of the NHSC, as a non-federally employed member of the NHSC under the "private practice assignment" (PPA) option, or as a private practitioner under the "private practice option" (PPO). These placement materials included a Site–Selection Questionnaire, on which the recipient was to rank her choices of regions to which she desired assignment, and to indicate her interest in a federal and/or a non-federal position. Plaintiff indicated on her questionnaire that she was interested in a non-federal assignment, but gave no answer as to whether or not she was also interested in a federal assignment. She ranked only Region II, the region including Puerto Rico, as her choice of region, and ranked Puerto Rico as the only "state" in which she was interested in serving amongst the states in Region II. No federal vacancies for physicians trained in obstetrics and gynecology were listed in Region II. There were, however, federal positions in this specialty in other Regions.

The placement materials informed plaintiff that she had from July 1, 1984, through September 30, 1984, to match to any approved vacancy anywhere in the country under the "Early Decision Alternative." The NHSC would allocate applicants who did not match during this period to a particular Region or state based upon their responses to the Site–Selection Questionnaire. Once so allocated, the recipient had until April 15, 1985, to match to a site on the HPOL. The NHSC would then assign any recipients who had not voluntarily matched by April 15, 1985, to specific sites to perform their service obligation. Plaintiff was also advised in these materials that recipients who did not accept a match during any of these placement phases would be held in default of their service obligation.

Plaintiff did not request placement under the Early Decision Alternative to a specific facility. She did however contact the Servicios Integrales de Salud de la Montana at Naranjito, Puerto Rico (Naranjito) to discuss rendering her obligated service at that facility. Naranjito is an entity created by and governed by the Commonwealth of Puerto Rico, and was located in a designated HMSA. In a letter dated September 19, 1984, attached to her completed Site–Selection Questionnaire, plaintiff wrote that she had spoken with Dr. Castellanos, Executive Director of Naranjito, about placement there, and requested that she be assigned to this non-federal entity to fulfill her ser-

---

**2.** The total amount of NHSC scholarship aid awarded to plaintiff over the course of three years was $21,653.60.

vice obligation. Plaintiff also indicated that "[i]t will be impossible to [sic] me to go to the mainland, at this moment, for my scholarship obligation due to personal problems." Dr. Castellanos also wrote to the NHSC on September 20, 1984, to request that plaintiff be assigned to Naranjito.

On December 13, 1984, the NHSC granted plaintiff's request for assignment to Region II, and advised her that if she wished to match to a site of her selection, she must complete an application by April 15, 1985. If she did not voluntarily match to a site by that time, the NHSC would assign her to a "high-priority site based on the needs of the service. *Sites selected by the NHSC in this procedure may not be in the same region or State as your original assignment.*" (emphasis in original)

On February 1, 1985, Dr. Rodriguez, Acting Executive Director of Naranjito, informed the NHSC that plaintiff and his organization had agreed that she would provide service at the entity once NHSC approved the placement. On February 6, 1985, plaintiff again requested in writing that she be assigned to Naranjito. The NHSC informed plaintiff of its conditional approval of this placement on March 4, 1985. In this same letter, the NHSC advised plaintiff not to make any financial commitments in reliance upon this conditional approval until she received final confirmation of the placement. On April 18, 1985, the NHSC did in fact notify plaintiff of the final approval of this placement. On June 5, 1985, the NHSC sent plaintiff copies of a written agreement which was to be signed "prior to [the NHSC] authorizing [plaintiff] to fulfill [her] service obligation under the Private Practice Assignment (PPA)." The pertinent parts of the agreement read as follows:

PRIVATE PRACTICE ASSIGNMENT
AGREEMENT

Section 331(a)(1) of the Public Health Service Act ("Act"), as amended (42 USC 254d(a)(1)(C)) by Public Law 97–35 effective August 13, 1981, established a new category of National Health Service Corps (NHSC) members, that is, individuals who are not employees of the United States. These individuals are assigned to NHSC sites in the same manner as federally employed NHSC members are assigned to sites; however, they are subject to the personnel system of the entity to which they are assigned and they must receive an income from the entity at least equal to the income of a civilian employee of the United States. The signatures of the Individual and the Secretary below indicate that any scholarship contract(s) previously entered into by the individual under (1) the National Health Service Corps (NHSC) Scholarship program (section 751 of the Act as in effect prior to its August 13, 1981, amendment and redesignation as section 338A of the Act by section 2709(a) of Public Law 97–35) ... are hereby amended to allow the individual to fulfill his or her scholarship service obligation as a member of the NHSC who is not an employee of the United States. The terms and conditions of this Private Practice Assignment are as follows:

1. The undersigned Individual is assigned as a member of the NHSC who is not an employee of the United States to *Naranjito Health Center P.O. Box 525, Naranjito, Puerto Rico 00719* (hereinafter "Entity") for the period from *August 1, 1985* to *July 31, 1988.*

2. During the period of this assignment, the Individual will be:

a. employed by the Entity in the full-time clinical practice of his or her profession and subject to the personnel system of such entity (section 331(d)(3) of the Act);

b. paid an income by the Entity which is at least equal to the income which he or she would receive if he or she were a civilian employee of the United States (section 331(d)(3) of the Act);

. . . .

d. responsible for obtaining malpractice insurance (Individuals providing health services under a Private Practice Assignment are *not* protected against personal liability for alleged malprac-

tice under the Federal Tort Claims Act, 28 U.S.C. 1346(b); 2671–2680);

. . . .

3. . . . Termination by the Individual or termination due to the Individual's failure to fulfill the employment requirements of the Entity or the requirements of the Private Practice Assignment will subject the Individual to the financial repayment provisions described in paragraph 4.

4. An individual who fails to begin or complete the Private Practice Assignment set forth in this agreement must repay the Federal Government an amount determined under the formula in section 754(c) of the Act (as in effect prior to its August 13, 1981, amendment and redesignation as section 338D of the Act by Public Law 97–35) for any obligation incurred under the NHSC program. . . .

Plaintiff's service was to have commenced on August 1, 1985.

By statute, a private practice assignment position must be one which is financially commensurate with a NHSC federal position. *See* 42 U.S.C. §§ 254d(a)(1)(C), 254f. Recipients assigned to non-federal positions under the PPA option become employees of the entities and are paid directly by those organizations at rates of pay negotiated between the recipient and the organization. *See* PPA Agreement. Plaintiff was aware, through her discussions with Dr. Castellanos that the Naranjito position was not financially commensurate; however, Dr. Castellanos was willing to waive certain NHSC policy prohibitions in order to enable plaintiff to perform additional work to place herself in a commensurate position. Plaintiff was later informed that, because of a change in policy, in order for her to earn additional income by working on her own during her free time, she needed to receive a waiver of the NHSC prohibitions from the Secretary of Health of Puerto Rico. Her request for such a waiver was denied on April 17, 1985, despite the fact that she had already made commitments to earn additional income during her free

time. Because of this, plaintiff no longer desired to render her services at Naranjito; accordingly, she refused to execute her PPA Agreement.

In June and July of 1985, plaintiff requested a reassignment to the Loiza Health Center (Loiza) in Puerto Rico. Plaintiff did not commence fulfilling her service obligation at Naranjito on August 1, 1985. On August 29, 1985, the NHSC orally informed plaintiff that her request for reassignment had been denied because Loiza had no approved NHSC vacancy. The NHSC also advised plaintiff that if she did not report to Naranjito, she was likely to be placed in default. On September 18, 1985, the NHSC informed plaintiff by telegram that it was recommending that she be placed in default of her service obligation. On September 20, 1985, plaintiff wrote to the NHSC, stating that she could not understand how she could be placed in default because she had not yet received a formal written response to her request for reassignment to Loiza. She further wrote that during the matching process, she had planned to visit some health centers in the mainland and had considered moving there to perform her service obligation. However, based upon Dr. Castellanos' representations about the Naranjito position, she had decided to request assignment to Naranjito instead of seeking alternate positions.

On October 4, 1985, the NHSC informed plaintiff in writing that her request for reassignment to Loiza was denied, and that she had five days to report to Naranjito or the NHSC would then place her in default. The NHSC sent plaintiff another copy of the Private Practice Assignment Agreement to sign. Plaintiff again refused to sign the Agreement and to perform any of her service obligation at Naranjito, or elsewhere. The only position to which plaintiff has ever been assigned is Naranjito, where, at her request, she would have been a non-federal employee. The NHSC follows a routine procedure to determine the status of a recipient who has refused to execute a PPA agreement. A scholarship recipient who requests placement at a PPA site and then refuses to enter into a PPA agreement to finalize the placement is placed in

default of his or her service obligation; he or she is not assigned to a different site. On October 10, 1985, plaintiff was placed in default.

Under the statutory terms, then–42 U.S.C. § 294w(c), and Section C(3) of the Contract, once in default, a scholarship recipient is afforded a one-year grace period during which he or she is to pay the penalty for default. If the recipient has not paid the penalty at the expiration of this year, the Secretary may commence collection action against the recipient.

■ Plaintiff did not pay the penalty for default. Instead, on September 24, 1986, she filed suit against defendant in the United States District Court for the District of Puerto Rico. Plaintiff claimed that the NHSC had breached the parties' contract, and that she had suffered mental anguish and harassment in addition to monetary damages as a result of the alleged breach and her default status. On September 16, 1988, the district court held that it lacked the necessary subject matter jurisdiction to adjudicate plaintiff's claim under the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491, as her claim was one sounding in contract for damages exceeding $10,000. Accordingly, the district court transferred the case to the United States Claims Court[3] pursuant to 28 U.S.C. § 1631. On October 24, 1988, plaintiff filed her amended complaint in this court, seeking $57,642.44 in lost income, $20,625.00 for malpractice insurance, $5,000.00 for continuing education expenses, $2,475.00 in legal fees, $20,000.00 for lost "working hours," and $140,000.00 for harassment and mental anguish, all based on defendant's alleged breach of contract.[4] On January 11, 1989, defendant filed a counterclaim against plaintiff for $141,729.63 plus continually accruing damages calculated according to the statutory formula contained in the agreement.[5]

## PROCEDURAL HISTORY

This case has a somewhat unusual procedural history. On June 30, 1989, defendant filed a motion to dismiss for lack of subject matter jurisdiction, pursuant to RUSCC 12(b)(1). Judge Reginald W. Gibson of this court held a status conference on December 11, 1989, at which he urged the parties to reach settlement on all of the issues. Since the parties could not settle their claims, Judge Gibson held another status conference on August 16, 1990, to determine progression of the case should the court deny the motion to dismiss. At the latter status conference, Judge Gibson stayed decision on defendant's motion to dismiss, and ordered the parties to file a joint status report advising him how they intended to proceed should defendant's motion be denied. Judge Gibson also ordered that if the parties intended to proceed via cross-motions for summary judgment, plaintiff should file her motion first, in accordance with a briefing schedule set by the court. Judge Gibson indicated that the court would then rule on all motions simultaneously. On October 25, 1990, the parties submitted a joint status report advising that should the court deny the motion to dismiss, they intended to proceed via cross-motions for summary judgment. The parties subsequently submitted their motions and appropriate responses.

On November 19, 1992, this case was transferred to Judge Moody R. Tidwell. In accordance with Judge Gibson's order of August 17, 1990, the court will rule on

---

3. The Federal Courts Administration Act of 1992, Pub.L. No. 102–572, 106 Stat. 4506 (1992), enacted on October 29, 1992, changed the name of the United States Claims Court to the United States Court of Federal Claims. The United States Court of Federal Claims is the successor to the United States Claims Court in all respects.

4. The court notes that plaintiff's claim for $140,-000.00 for harassment and mental anguish is a claim "sounding in tort," and thus clearly outside this court's jurisdiction under 28 U.S.C.

§ 1491(a)(1). *E.g., Berdick v. United States,* 612 F.2d 533, 536, 222 Ct.Cl. 94 (1979); *Curry v. United States,* 609 F.2d 980, 982, 221 Ct.Cl. 741 (1979); *Eastport S.S. Corp. v. United States,* 372 F.2d 1002, 1010, 178 Ct.Cl. 599 (1967).

5. As of June 1, 1991, the penalty owed by plaintiff was calculated to be $175,634.04. As the court has not received a more recent calculation, further proceedings must be held to determine the exact amount of the penalty owed by plaintiff as of the date of judgment.

defendant's motion to dismiss and the parties' cross-motions for summary judgment.

## DISCUSSION

### I. MOTION TO DISMISS

▮▮▮ In considering defendant's motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), the court must accept as true any undisputed allegations of fact made by the non-moving party. *Reynolds v. Army and Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir. 1988). When disputed facts relevant to the issue of jurisdiction exist, the court may decide those questions of fact. *Reynolds*, 846 F.2d at 747; *Hedman v. United States*, 15 Cl.Ct. 304, 306 (1988). When subject matter jurisdiction is questioned, the non-moving party bears the burden of establishing the court's jurisdiction. *Reynolds*, 846 F.2d at 748. Here, defendant moves for dismissal claiming that the scholarship agreement signed by both parties is governed by statutory, not contractual, principles, and that the statute upon which the agreement is founded is not a money-mandating one. Therefore, defendant claims, plaintiff's claim is outside the jurisdiction of the court as defined by the Tucker Act. *See* 28 U.S.C. § 1491(a)(1) (1988). The court is unpersuaded by defendant's argument.

▮▮▮ It is well established that the United States "as sovereign, is immune from suit save its consent to be sued." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769, 85 L.Ed. 1058 (1941). Furthermore, for the Court of Federal Claims to exercise jurisdiction, a waiver of traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). This court is mindful that "[i]n construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress." *Fidelity Constr. Co. v. United States*, 700 F.2d 1379, 1387 (Fed. Cir.1983).

▮▮▮ The parties premise their arguments on the Tucker Act. The Tucker Act specifically grants the Court of Federal Claims jurisdiction over claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States...." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, does not create a substantive right to money damages. *United States v. Testan*, 424 U.S. 392, 398, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976); the statute underlying plaintiff's claim must be one granting plaintiff, "expressly or by implication, a right to be paid a certain sum." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007, 178 Ct.Cl. 599 (1967). The nature of plaintiff's claim falls within the ambit of those cases which the *Eastport* court indicated were within the court's jurisdiction. *See id.*, 372 F.2d at 1008. Moreover, "if the claim under a given statute or regulation is at least arguable, then the matter may be considered here." *Heim v. United States*, 22 Cl.Ct. 341, 343 (citing *Ralston Steel Corp. v. United States*, 340 F.2d 663, 667, 169 Ct.Cl. 119, *cert. denied*, 381 U.S. 950, 85 S.Ct. 1803, 14 L.Ed.2d 723 (1965)), *aff'd mem.*, 949 F.2d 403 (Fed.Cir.1991).

▮▮▮ Plaintiff applied for a scholarship under the NHSC Scholarship Program, a program established by statute and implemented by contract. The parties signed three documents entitled "National Health Service Corps Scholarship Program Contract," "Extension and Amendment of 1978–79 National Health Service Corps Scholarship Program Contract," and "Extension and Amendment of 1979–80 National Health Service Corps Scholarship Program Contract." Moreover, pursuant to Public Law 94–484, effective October 1, 1977, which amended then–42 U.S.C. § 294t, prospective scholarship recipients were required to enter into a written contract with the Secretary in order to be eligible to participate in the program. 42 U.S.C. § 294t(b)(4) (1976 & Supp. V 1982). For jurisdictional purposes, then, the parties' agreements constitute a contract;

however, the contract is one governed by statutory principles rather than general contractual rules. *See, e.g., Rendleman v. Bowen,* 860 F.2d 1537, 1541–42 (9th Cir. 1988); *Hahn v. United States,* 757 F.2d 581, 590 n. 8 (3rd Cir.1985); *Aiken v. United States,* 4 Cl.Ct. 685, 692 (1984). As *Rendleman* explains, the legislative intent of the Public Health Service Act sections establishing the NHSC Scholarship Program was to

> implement certain public policy goals by conditioning receipt of scholarship aid upon compliance by the recipient with federal statutory and administrative directives. These conditions do not arise from a negotiated agreement between the parties; rather, they are provided for in the statute. Statutory intent, therefore, is more relevant to the interpretation of these conditions than are common law contract principles.
>
> ... The only terms contained in the written agreement signed by a recipient are those required by the statute.... Other conditions that affect scholarship recipients' service, such as the designation of HMSAs, are not included in the contract, although Congress addressed those issues in the statute.

*Rendleman,* 860 F.2d at 1541–42 (citations omitted).

Moreover, the statute upon which plaintiff premises her claim is arguably a money-mandating one. Plaintiff claims that she is entitled to lost wages, as well as to other monetary damages, based on defendant's alleged failure to assign her to a federal position in accordance with her scholarship agreement, or, in the alternative, that defendant assigned her to a non-federal position which was not financially commensurate with a federal position as required by statute. *See* 42 U.S.C. § 254d(a)(1)(C), (d)(3). Section 254d(d)(3) provides that

> A member of the Corps [who is not a federal employee] shall when assigned to an entity under section 254f of this title

[relating to criteria surrounding placement of NHSC members] be subject to the personnel system of such entity, except that such member shall receive during the period of assignment the income that the member would receive if the member was a [civilian member of the NHSC].

42 U.S.C. § 254d(d)(3) (1982). This section entitles a NHSC scholarship recipient to a sum certain, and is thus arguably money-mandating. Moreover, the basis for defendant's counterclaim is certainly money-mandating.[6] The court finds, therefore, that plaintiff's claim is within Tucker Act jurisdiction. The court therefore denies defendant's motion to dismiss, except to the extent that plaintiff's claim for damages for harassment and mental anguish is dismissed. *See* note 4, *supra.*

## II. CROSS–MOTIONS FOR SUMMARY JUDGMENT

### A. Summary Judgment Standard

■ Summary judgment is properly granted when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir. 1987) (citing *Armco, Inc. v. Cyclops Corp.,* 791 F.2d 147, 149 (Fed.Cir.1986)). In considering a motion for summary judgment, the evidence must be viewed, and inferences drawn, in a light most favorable to the non-moving party. *Litton Indus. Prod., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985); *D.L. Auld Co. v. Chroma Graphics Corp.,* 714 F.2d 1144, 1146 (Fed.Cir.1983). The parties submitted joint stipulations of fact, which the court has adopted as set out above, as well as other evidence in support of their claims.

### B. Plaintiff's Arguments

Plaintiff first argued that defendant breached the parties' contract by failing to

---

**6.** Defendant claims damages under Section C(3) of the parties' agreement and pursuant to 42 U.S.C. § 294w(c) (subsequently amended and renumbered 42 U.S.C. § 254o(b)(1) in 1981).

This provision contains the liquidated damages clause of the agreement as provided for in the statute.

assign her to a federal position with the salary and benefits accorded that position. Second, plaintiff argued that her request to be assigned to Naranjito without more is insufficient to amend the contract executed by the parties. Finally, and in the alternative, plaintiff claimed that even if the NHSC could have assigned her to a PPA without her consent, she was entitled to an income equivalent to that of a civilian federal member of the NHSC. Since the Naranjito position did not offer an equivalent salary, plaintiff contended, the NHSC breached the contract by assigning her there. The court finds that defendant did not so breach the contract.

■ Plaintiff had no vested right to a federal position. *United States v. Hatcher,* 716 F.Supp. 447, 449 (S.D.Cal.1989); *United States v. Turner,* 660 F.Supp. 1323, 1328–30 (E.D.N.Y.1987); *Aiken,* 4 Cl.Ct. at 692; *but cf. United States v. Larionoff,* 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977), (where plaintiff-servicemen who had been entitled to a bonus for extending the period of their enlistment at the time they agreed to so extend remained entitled to the bonus notwithstanding subsequent regulatory changes rendering them ineligible to receive the bonus). *Aiken* held that plaintiff-scholarship recipient had no contractual or other right to a federal internship or residency, and even assuming he did, that right did not vest until he completed his academic training; until then, Congress was free to revoke it. *Aiken,* 4 Cl.Ct. at 692. The 1981 amendments to the NHSC laws accorded the Secretary the discretion to accept recipients into the NHSC as non-federal members. 42 U.S.C. § 254d(a)(1)(C). By the time plaintiff was ready to enter the placement process, the placement opportunities, along with the discretion of the Secretary, had expanded.

■ Plaintiff's request for placement at Naranjito in a PPA, plus NHSC approval of that request, was sufficient to constitute a "match," and once matched, the NHSC's obligation to assign plaintiff to a different position ended. As stated above, the NHSC follows a routine procedure to determine the status of a recipient who has refused to execute a PPA agreement: that recipient who requests placement at a PPA site and then refuses to enter into a PPA agreement to finalize the placement is placed in default of his or her service obligation; he or she is not usually assigned to a different site. However, one who does not voluntarily match to a site during the prescribed time limits is assigned a site based upon the priority needs of the NHSC. The facts are undisputed that plaintiff *voluntarily* requested assignment to Naranjito, a PPA, but refused to sign the documentation formalizing her acceptance of the placement. She was accordingly placed in default. The NHSC had no further obligation to place her in any other position— federal or non-federal—pursuant to 42 U.S.C. § 254f or the placement materials because she was matched during the second phase of the 1985 placement cycle. Moreover, even had plaintiff been assigned to Naranjito involuntarily, it was within the Secretary's discretion to place her there. *See United States v. Duffy,* 879 F.2d 192, 196 (6th Cir.1989); *Rendleman,* 860 F.2d at 1543; *Hatcher,* 716 F.Supp. at 449.

■ Finally, plaintiff may not recover for lost wages and other expenses she claims she was entitled to by virtue of her assignment to a non-federal position, which she neither accepted nor performed. An individual is not entitled to receive pay or other benefits of a position unless and until he or she has qualified as an employee by having performed the function of that position. *See, e.g., McCarley v. MSPB,* 757 F.2d 278, 280 (Fed.Cir.1985), *overruled on other grounds by Hagmeyer v. Department of Treasury,* 852 F.2d 531, 532 (Fed. Cir.1988) (*en banc*) (on appeal from a decision of the MSPB, the proper respondent is the employing agency, not the MSPB); *National Treasury Employees Union v. Reagan,* 663 F.2d 239, 246 (D.C.Cir.1981); *Heim,* 22 Cl.Ct. at 344; *Ayala v. United States,* 16 Cl.Ct. 1, 4 (1988); *see also, United States v. Redovan,* 656 F.Supp. 121, 127 (E.D.Pa.1986), where the plaintiff-NHSC scholarship recipient did not discharge his service obligation by presenting himself as ready, willing and able to perform service

at a placement site other than the one to which he was assigned, *aff'd mem.*, 826 F.2d 1057 (3rd Cir.1987); *Gilbert v. United States,* 10 Cl.Ct. 501, 518–20 (1986), *aff'd mem.*, 824 F.2d 978 (Fed.Cir.1987).

For the reasons set out above, the court allows defendant's motion for summary judgment, as a matter of law, as to liability.

### C. Defendant's Counterclaim

Under the applicable law, defendant is entitled to recover damages from plaintiff according to the formula set out in the scholarship agreement and 42 U.S.C. § 294w(c) (current version at 42 U.S.C. § 254o(b)(1) (1988 & Supp. II 1990)). As noted above, this amount has been calculated to be $175,634.04 as of June 1, 1991. Aside from disputing her liability, plaintiff has neither disputed this figure nor challenged the method by which it was calculated. As defendant has met its burden of proof with regard to showing that this is the amount to which it is entitled under the parties' contract and the applicable statutory section, the only issue remaining is the amount of damages which have continued to accrue since June 1, 1991.

### CONCLUSION

For the foregoing reasons, the court denies defendant's motion to dismiss, except to the extent that plaintiff's claim for damages for harassment and mental anguish is dismissed. In addition, the court denies plaintiff's motion for summary judgment and grants, in part, defendant's cross-motion for summary judgment. Further proceedings will be held on the quantum of damages to which defendant is entitled. The parties are directed to file with the court within 30 days of the date of this order a stipulation of the amount of defendant's counterclaim calculated according to the applicable formula.

IT IS SO ORDERED.