**In re James J. SIMONE, Debtor.**

**James J. Simone, Plaintiff,**

**v.**

**United States of America, Indian Health Service, Defendants.**

**United States of America, Counter-claimant,**

**v.**

**James J. Simone, Counter-defendant.**

**Bankruptcy No. 05–94720.**
**Adversary No. 06–09040.**

United States Bankruptcy Court, C.D. Illinois, Danville Division.

Sept. 27, 2007.

Gus R. Regas, Kankakee, IL, for Plaintiff/Counter-defendant.

David H. Hoff, United State's Attorney, U.S. Attorney's Office, Urbana, IL, for Defendants/Counter-claimant.

***ORDER GRANTING THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT AND ENTERING A MONETARY JUDGMENT AGAINST THE DEBTOR***

GERALD D. FINES, Bankruptcy Judge.

### Findings of Fact and Conclusions of Law

This matter came to be heard in open court on September 13, 2007, with proper notice of hearing, on: (1) the United States' Motion for Summary Judgment (docket entry # 56), seeking a monetary judgment against the debtor counter-defendant, James J. Simone, hereinafter called Simone, and an order denying the debtor's complaint for discharge of this debt (docket entry # 1); (2) Simone's Response (docket # 66) to said Motion for Summary Judgment; and (3) the United States' Reply (docket # 71) thereto, with Simone being present in person and by his attorney Gus Regas, and the United States of America being present by Assistant United States Attorney David H. Hoff.

The United States, in its Motion for Summary Judgment, seeks a monetary judgment against Simone in the amount of $124,462.92 (as of May 1, 2007), plus interest accruing after May 1, 2007, until entry of judgment, plus post-judgment interest, and an order denying Simone's complaint to discharge this debt.

Simone's debt arose out of a statutory repayment obligation that was triggered when he breached his Indian Health Service's ("IHS") Loan Repayment Program contract by resigning one year into his two-year service obligation. Simone also breached the terms of the contract by misusing the money paid to him by IHS for repayment his pre-existing student loans, instead using it for a purpose other than repaying his educational loans. The statutory repayment obligation arises when a Loan Repayment Program participant fails for any reason to complete his full service obligation. In this case, Simone resigned from his position of employment with the Indian Health Service, tendering his resignation one year and five days after signing his Loan Repayment Program contract, in which he agreed to a two-year service obligation with the Indian Health Service. As a result of Simone's resignation, he completed only 376 days of his two-year service obligation.

The United States, in its Motion for Summary Judgment, also requests that this Court refuse to discharge the debt in bankruptcy because Simone cannot meet the unconscionability standard required by statute (25 U.S.C. § 1616a(m)(4)) to discharge the debt. The United States contends that Simone has the financial ability to pay his Loan Repayment Program repayment obligation. In addition, the United States contends that Simone could not use the outstanding educational loan debt he owes to the United States Department of Education ("DOE") as a defense to this motion for summary judgment because he would owe significantly less to DOE if he had properly used the money he received from the Loan Repayment Program to pay down those loans.

Simone has not submitted any legal authority challenging the United States' right to the monetary judgment now sought in the Government's Motion for Summary Judgment. Similarly, Simone has cited no legal authority supporting his argument that an order declaring the Loan Program Repayment debt to be nondischargeable would be unconscionable. Simone did not object to any statements of

fact in the United States' Motion for Summary Judgment and acknowledged during oral argument before this Court that there are no disputed statements of material fact in the United States' Motion for Summary Judgment. Simone challenged the facts stated at pp. 8–11 of the Parties' Joint Pretrial Statement (docket # 27), but only for relevance and materiality. Those objections are overruled.

This Court hereby grants the United States' Motion for Summary Judgment denying the debtor's motion to discharge his indebtedness owed to the Indian Health Service and entering a monetary judgment in favor of the United States and against the debtor, James J. Simone, for $127,291.24, being the amount of the debt and interest accrued through September 13, 2007, and also awarding post-judgment interest on said judgment amount for the reasons set forth hereinbelow.[1]

### STATUTORY OVERVIEW

Title 28 U.S.C. §§ 157, 1334, and 1345, and Rule 7008 of the Federal Rules of Bankruptcy Procedure vest this Court with subject matter jurisdiction to decide the United States' counter-claim as a core proceeding.

The Indian Health Service is an agency within the United States Department of Health and Human Services ("HHS" or "Secretary"). Its primary mission is to provide health care services to American Indians/Alaska Natives. IHS pursues this mission in accordance with its authorizing legislation, including the Indian Health Care Improvement Act ("IHCIA"), codi-

fied at 25 U.S.C. §§ 1601–1683, which contains the primary provision at issue in this litigation. In addition, IHS is bound by the mandates of the Indian Child Protection and Family Violence Prevention Act ("the Act"), codified at 25 U.S.C. §§ 3201–3210. Among other things, the Act imposes requirements on IHS for protecting Indian children from potential abuse by federal employees.

### I. *The Indian Health Care Improvement Act*

The IHCIA serves as the authorizing legislation for numerous IHS programs, including the Loan Repayment Program. 25 U.S.C. § 1616a. Congress intended the Loan Repayment Program ("LRP") to further IHS' mission by "assur[ing] an adequate supply of trained health professionals necessary to maintain accreditation of, and provide health care services to Indians through, Indian health programs." 25 U.S.C. § 1616a(a)(1).

Persons interested in participating in the LRP submit an application to the Rockville, Maryland, office of the LRP. Exhibit 30 p. 9 (IHS Loan Repayment Program Information and Application). The Secretary, acting through IHS, determines who shall receive loan repayment awards. 25 U.S.C. § 1616a(d)-(e). The awards are distributed among the health professions, based on the relative needs of American Indians/Alaska Natives for additional services in each of the professions. 25 U.S.C. § 1616a(d)-(e). In exchange for a loan repayment award, the recipient must agree to serve in full-time clinical practice in an Indian health program for a

---

1. The factual citations in this Order are to the paragraphs in the Joint Pretrial Statement (Docket Entry 27) and those items described on the List of Exhibits Submitted Electronically in Support of the United States' Motion for Summary Judgment on May 11, 2007 (Docket Entry # 34), which include: Exhibits 1–34 to the Statement of Facts; the Certified Statement of Disposition; the Declarations of David Azure, Barry Blum, Tom Eaglestaff, and Jaccqueline Santiago; the Deposition of Dr. James Simone, and attached exhibits to that Deposition.

period of at least two years. 25 U.S.C. § 1616a(f)(1)(B)(iii). An individual's service for purposes of the LRP contract begins on the date that the Secretary executes the LRP. 25 U.S.C. § 1616a(e)(1). Although the LRP will help a program participant identify qualifying positions in which to fulfill his service obligation, the LRP is not responsible for the hiring of the individual. Instead, the participant must identify a qualifying position, apply for the position to the hiring official, receive an offer of employment, and report the qualifying position to the LRP.

A LRP awardee who fails to fulfill his service obligation, "for any reason," becomes liable to the United States for the amount determined by the statute. 25 U.S.C. § 1616a(*l*)(2). The repayment obligation protects the aim of the statute, which is "to assure an adequate supply of health professionals to the Service, Indian tribes, tribal organizations, and urban Indian organizations involved in the delivery of health care to American Indians and Alaska natives." 149 Cong Rec E 1215, 1216 (2003). Cancellation of the obligation is permitted only upon: 1) death of the individual; 2) a waiver by the Secretary for cases involving either impossibility or extreme hardship, and unconscionability; or 3) discharge by a bankruptcy court that finds nondischarge would be unconscionable. 25 U.S.C. § 1616a(m).

II. *The Indian Child Protection and Family Violence Prevention Act*

As a condition for both participation in the LRP, 25 U.S.C. § 1616a(b)(2), and federal employment, an individual must qualify for Federal employment. The Indian Child Protection and Family Violence Prevention Act ("the Act"), codified at 25 U.S.C. §§ 3201–3210, establishes "minimum standards of character" for certain Federal positions. 25 U.S.C. § 3207 (1994

& Suppl. IV 1999). Introduced by Senator John McCain, Congress adopted the Act after reported abuse of Indian children in schools operated by the Bureau of Indian Affairs. S. 2340, 101st Cong., 136 Cong. Rec. 3284 (1990) (enacted). As stated by Senator McCain, "[i]n each of these tragic cases Indian children who were the victims of sexual abuse were in turn victimized by the failure of the Federal government to respond to their needs." *Id.* He went on to state that "[e]ach year thousands of Indian children are victims of physical abuse and neglect. Little assistance has been provided by either the Bureau of Indian Affairs or the Indian Health Service to improve efforts of Indian tribes to provide adequate child protection services on the reservations." *Id.*

In passing the Act, Congress concluded that "multiple incidents of sexual abuse of children on Indian reservations have been perpetrated by persons employed or funded by the Federal Government." 25 U.S.C. § 3201(a)(1)(c) (1994 & Suppl. IV 1999). Furthermore, Congress indicated that the "Federal Government investigations of the background of Federal employees who care for, or teach, Indian children are often deficient." 25 U.S.C. § 3201(a)(1)(D) (1994 & Suppl. IV 1999). Congress intended for the measures laid out in the Act to reduce incidents of such abuse. 25 U.S.C. § 3201(a)(2)(A) (1994 & Suppl. IV 1999).

One of those measures dictates the terms under which IHS may employ certain individuals in specified positions. The Act requires IHS to investigate employees who are serving in positions where they have "regular contact with, or control over, Indian children" to ensure that the persons serving in these positions meet "minimum standards of character." *See* 25 U.S.C. § 3207(a)(1) (1994 & Suppl. IV 1999). By determining that each employee

who serves in these positions meets the minimum standards of character, IHS helps "ensure that Indian children are protected." 42 C.F.R. § 136.402.[2] When an individual is determined not to meet these minimum standards, Congress has prohibited their employment in such positions. 25 U.S.C. § 3207(b) (1994 & Suppl. IV 1999). Thus, IHS may not employ any individual in a § 3207(a)(1) position if that person has "been found guilty of, or entered a plea of nolo contendere or guilty to, any offense under Federal, State, or tribal law involving crimes of violence; sexual assault, molestation, exploitation, contact or prostitution; or crimes against persons." 25 U.S.C. § 3207(b) (1994 & Suppl. IV 1999).[3] Once IHS discovers that an employee has been found guilty of or entered a plea to one of these offenses, "IHS must deny employment to an individual or dismiss an employee, when the duties and responsibilities of the position the individual person would hold or holds involve regular contact with or control over Indian children." 42 C.F.R. § 136.416.[4]

---

**2.** Pursuant to the Act, IHS promulgated regulations in 2002. *See* 42 C.F.R. §§ 136.401–136.418.

**3.** This version of the Act was in effect during the time relevant to this case. More recently, the Act was amended. Instead of requiring "any offense," the Act now requires "any felonious offense, or any of two or more misdemeanor offenses." 25 U.S.C. § 3207(b) (2000).

**4.** The regulations were not in effect until 2002, three years after Simone resigned from IHS employment. However, the regulations help demonstrate the purposes of the Act and IHS' understanding of its responsibilities under the Act.

**5.** The Joint Pretrial Statement included a Statement of Undisputed Facts and was submitted in compliance with this Court's standing Pretrial Order. Establishment of facts in

## STATEMENT OF FACTS NOT IN DISPUTE

**I. *The Loan Repayment Program Contract***

**1.** Simone originally applied to participate in the LRP in May 1995. Pretrial Statement ¶ 6[5] and Exhibit 4.

**2.** At the time of his application, Simone listed approximately $76,500 in qualifying educational loan debt. Pretrial Statement ¶ 7 and Exhibit 4.

**3.** IHS did not accept Simone into the LRP until 1998, when it notified him of his acceptance in a letter dated January 30, 1998. Pretrial Statement ¶ 16 and Exhibit 13.[6]

**4.** Simone executed the IHS Loan Repayment Program contract on February 12, 1998, and the Secretary's authorized representative countersigned the contract on March 9, 1998. Pretrial Statement ¶ 17 and Exhibit 14.

**5.** Under the contract, IHS promised to pay up to $78,600, including $60,000 for

---

the pretrial order makes those facts undisputed for purposes of a summary judgment motion. *Capitol Records, Inc. v. Progress Record Distrib., Inc.*, 106 F.R.D. 25, 28 (N.D.Ill. 1985). In addition, both parties have stipulated to the facts recited in the Joint Pretrial Statement, subject to Simone's argument that certain facts were neither material nor relevant. As explained above, this Court overrules Simone's objections of relevance and materiality to the facts stated at pp. 8–11 of the Parties' Joint Pretrial Statement.

**6.** The letter erroneously gives the date of January 30, 1997, as the date Simone was accepted into the program. However, the award was for fiscal year ("FY") 1998, as indicated in the first paragraph. The determination to accept Simone into the LRP for FY 1998 could not have been made in January 1997, since that would have preceded FY 1998. In addition, the first paragraph requests a reply by February 27, 1998.

.

loan repayment and $18,600 for income tax liability. Pretrial Statement ¶ 18 and Exhibit 14.

6. In exchange, Simone promised, among other things: (a) to serve for a period of two years in full-time clinical practice in an Indian health program; and (b) to apply his loan repayment to his health professions educational loans. Pretrial Statement ¶ 20 and Exhibit 14.

7. Simone also agreed that if he "breache[d] his[ ] contract by failing either to begin, or complete, [his] period of obligated service in accordance with Section 108(f) [codified at 25 U.S.C. § 1616a(f)], the United States shall be entitled to recover" the amount determined by application of the statutory formula. Pretrial Statement ¶ 21 and Exhibit 14. *See also* 25 U.S.C. § 1616a(*l* ).

8. Simone admits that he read the contract and was aware of his obligations and the result of any breach, including the repayment obligation and the unconscionability standard for discharge of that obligation. Simone Deposition 100–03.

9. When Simone entered his LRP contract in March 1998, he had recently begun working as a Supervisory Clinical Psychologist at the Aberdeen Area Youth Regional Treatment Center ("AAYRTC"). Pretrial Statement ¶¶ 10, 13 and Exhibits 7, 10.

10. Since he was already employed by IHS in a qualifying position, Simone's LRP contract became effective on March 9, 1998, the date the Secretary's authorized representative signed the contract. Pretrial Statement ¶ 17 and Exhibit 14.

II. *Simone's Employment at AAYRTC*

11. In November 1997, Simone began his position at AAYRTC with a temporary appointment. Pretrial Statement ¶ 10 and Exhibit 7.

12. His appointment was changed to a career conditional appointment in January 1998. Pretrial Statement ¶ 13 and Exhibit 10.

13. AAYRTC is an IHS facility that provides residential drug and alcohol treatment to adolescents from the ages of 13 to 17 who are enrolled as members of a Federally recognized American Indian tribes. Decl. of Tom Eaglestaff ¶ 2.

14. As a Federal government employee, Simone's employment was subject to a background investigation. Decl. of David Azure ¶ 8.

15. Simone's investigation began in November 1997, Exhibit 17,[7] upon receipt of Simone's employment documents, including his completed "Declaration for Federal Employment" ("Form OF–306"), Exhibit 8, and an "Addendum to Declaration for Federal Employment, Indian Health Service, Child Care & Indian Child Care Worker Positions" ("Addendum"), Exhibit 9.

16. Simone completed a new Form OF–306 and Addendum in January 1998, when his status was changed from a temporary appointment to career conditional. Pretrial Statement ¶¶ 14, 15 and Exhibits 11, 12.

17. On both of his completed Forms OF–306, Simone answered "no" to the question, "During the last 10 years, have you been convicted, been imprisoned, been on probation, or been on parole?" Pretrial Statement ¶¶ 11, 14 and Exhibits 8, 11.

18. On both of his completed Addendums, Simone answered "no" to the question, "Have you ever been found guilty of, or entered a plea of nolo contendere (no contest) or guilty to, any offense under Federal, State, or tribal law involving

---

**7.** The record shows the investigation began on November 3, 1997. Exhibit 17, page 9.

crimes of violence; sexual assault, molestation, exploitation, contact, or prostitution; or crimes against persons?" Pretrial Statement ¶¶ 12, 15 and Exhibits 9, 12.

19. On September 8, 1998, the United States Office of Personnel Management ("OPM") issued a "Report of Agency Adjudicative Action" to the IHS Human Resources Office in South Dakota, in which OPM concluded that Simone's background investigation revealed "potentially actionable issue(s) which, standing alone, may be disqualifying under suitability/security considerations." Pretrial Statement ¶ 23 and Exhibit 17.

20. As part of its investigation, OPM received an investigative report from the Federal Bureau of Investigation ("FBI") that included arrests for:

(1) Simple Battery (April 18, 1971);

(2) Aggravated Battery (September 7, 1971);

(3) Aggravated Battery (September 8, 1971);

(4) Aggravated Assault, Resisting Arrest, Attempted Auto Theft, Criminal Trespass to Vehicle (September 30, 1971);

(5) Assault (November 3, 1971);

(6) Burglary (October 16, 1974);

(7) Trafficking in Dangerous Drugs, Trafficking in Marijuana (June 14, 1978);

(8) Trafficking in a Controlled Substance (August 17, 1978);

(9) Criminal Trespass to Land (December 5, 1979);

(10) Criminal Damage to Property (June 28, 1984);

(11) Patronizing a Prostitute (March 8, 1993); and

(12) Battery (August 5, 1993).

Pretrial Statement ¶ 24 and Exhibit 17.

21. The FBI report indicated Simone received sentences for four of the offenses:

(1) September 30, 1971, Aggravated Assault ("140 days H of C Concurrent");

(2) November 3, 1971, Assault ("sentence—40 DAS");

(3) June 14, 1978, Trafficking in Dangerous Drugs and Trafficking in Marijuana ("prison term"); and

(4) August 17, 1978, Trafficking in a Controlled Substance ("prison term").

Pretrial Statement ¶ 25 and Exhibit 17.

22. OPM also received a "Criminal History Record Information" from the Illinois State Police, which included the arrest for Aggravated Assault on September 30, 1971, and indicated a finding of guilt and sentence for that charge on November 3, 1972. Pretrial Statement ¶ 27 and Exhibit 17.

23. Most recently, Simone has not contested this background investigation, at least as it pertains to his convictions for aggravated assault and assault in 1971 and for the drug convictions in 1978, and has indicated that to do so "would be absurd." Simone Deposition 130.

24. The investigation also revealed that Simone pled guilty to the March 8, 1993, charge of patronizing a prostitute, for which he was placed on six months of court supervision. Pretrial Statement ¶ 28 and Decl. of David Azure ¶ 10. See also Exhibit 35.[8]

25. In addition to the standard background investigation conducted for Federal employees, IHS must also determine if

---

**8.** The record of the Circuit Court of Cook County indicates there was a "finding guilt [sic]" on March 30, 1993. Exhibit 35.

an employee who is in a position involving regular contact with or control over Indian children is suitable for employment under the Indian Child Protection and Family Violence Prevention Act. Decl. of David Azure ¶ 9. *See also* 25 U.S.C. § 3207 (1994 & Suppl. IV 1999).

26. After completing its own investigation of Simone's background, the IHS Human Resources Office in South Dakota issued a letter to Simone, dated January 5, 1999, requesting "clarification or an explanation" of the numerous charges. Pretrial Statement ¶ 28 and Exhibit 18.

27. Simone was familiar with this procedure, which included appeal rights, since in his capacity as Supervisory Clinical Psychologist of AAYRTC, he had previously been responsible for addressing unfavorable background investigations of employees under his supervision. Simone Deposition p. 111, 119, 131.

28. Simone responded in a letter dated January 20, 1999, explaining that he had "no recollection" of the earliest incidents,[9] admitting that he received probation for one of the 1978 drug charges, and stating that court supervision in the instance of the patronizing a prostitute charge "is not a conviction." [10] Pretrial Statement ¶ 29 and Exhibit 19.

29. The IHS Human Resources Office in South Dakota considered Simone's answer unsatisfactory. Decl. of David Azure ¶ 13.

30. As a result, on February 12, 1999, the Human Resources Office notified Simone's supervisor, Tom Eaglestaff, the Director of the AAYRTC, that he should propose Simone's removal. Decl. of David Azure ¶ ¶ 13, 14, Decl. of Tom Eaglestaff ¶ 7, and Exhibit 32.

31. Mr. Eaglestaff planned to present and discuss the proposed removal letter to Simone on February 17, 1999. Decl. of Tom Eaglestaff ¶ 8.

32. The letter stated that Mr. Eaglestaff was proposing Simone be removed from his position and from federal service for four reasons, including: (1) failure to meet the eligibility requirements of Public Law 101–630; (2) violation of the Crime Control Act of 1990; (3) Falsification of Optional Form 306; and (4) Falsification of Addendum to Declaration for Federal Employment. Pretrial Statement ¶ 30 and Exhibit 20.

33. When Mr. Eaglestaff raised the issue with Simone on February 17, 1999, Simone stated that he would resign. Decl. of Tom Eaglestaff ¶ 9 and Decl. of David Azure ¶ 16.

34. Since Simone resigned, Mr. Eaglestaff never issued the letter of proposed removal, Decl. of Tom Eaglestaff ¶ 9 and Decl. of David Azure ¶ 16, and therefore, Simone had no basis for challenging any removal action since it was never taken. Decl. of David Azure ¶ 16.

35. Had Simone not chosen to resign, Mr. Eaglestaff's letter of proposed removal would have only been the first of multiple stages in the removal process, which include: (a) issuance of a letter of proposed removal by the recommending official (Mr. Eaglestaff); (b) acknowledgment, by signature, of receipt of the proposed

---

9. More recently, Simone has admitted to the 1971 convictions for aggravated assault and assault, explaining that there was a guilty plea and an agreement that if he entered the military, his sentence would be limited to time served. Exhibit 26. Simone Deposition pp. 129, 130.

10. Although Simone continues to deny a conviction for this charge, the records of the Circuit Court of Cook County show a "finding guilty [sic]" on March 30, 1993, followed by six months of court supervision. Exhibit 35.

removal by the employee (Simone); (c) consideration of the proposed removal by the deciding official, who allows the employee the right to respond to all allegations before a final determination; (d) appeal of the deciding official's determination to remove to the Merit Systems Protection Board ("MSPB"); and (e) appeal of an adverse ruling by the MSPB to the United States Court of Appeals for the Federal Circuit. Decl. of David Azure ¶ 15.

36. On the same day as their discussion, Simone submitted a resignation letter stating that he was resigning due to "health and personal reasons" and indicating that March 20, 1999, would be his final day at AAYRTC. Pretrial Statement ¶ 31 and Exhibit 21.

37. On February 25, 1999, Mr. Eaglestaff notified Simone that, pending his resignation, he would be restricted to administrative duties and would no longer have access to the clinical areas of AAYRTC. Decl. of Tom Eaglestaff ¶ 11 and Exhibit 33.

III. *Terms of Breach in the LRP Contract*

38. On his last day of employment with IHS, March 20, 1999, Simone had served a total of 376 days from the effective date of the contract, March 9, 1998. Pretrial Statement ¶ 33 and Exhibit 29.

39. He has not served with IHS since March 20, 1999. Pretrial Statement p. 8, ¶ 1 (questioned by Simone only for relevance and materiality).[11]

40. Simone would not be eligible for employment in any position involving regular contact with or control over Indian children due to the requirements of the Indian Child Protection and Family Vio-lence Prevention Act, and most providers in IHS facilities, including psychologists, necessarily treat both adults and Indian children. Decl. of David Azure ¶ 17. *See also* Exhibit 26 p. 2.

41. In the one year Simone worked for IHS, the agency paid $39,300 of its obligation under the contract, including a payment of $30,000 on June 2, 1998, to Simone for loan repayment and a payment of $9,300 on December 30, 1998, on behalf of Simone for his increased income tax liability. Pretrial Statement ¶ 19 and Exhibit 15.

42. Simone did not use the $30,000 paid to him by IHS to repay his educational loans. Pretrial Statement ¶ 37 and Simone Deposition pp. 105–06.

43. On June 3, 2003, the LRP sought verification from Simone that he had completed the two years of service required by his LRP contract. Pretrial Statement p. 8, ¶ 2 and Exhibit 23.

44. On July 28, 2003, IHS informed Simone that he was at risk of defaulting on his LRP obligation, as a result of his failure to serve with IHS for the two-year term specified under the contract. Pretrial Statement p. 8, ¶ 3 and Exhibit 24.

45. IHS also indicated that, if compliance with the contract was impossible or would involve an extreme hardship, Simone could request a waiver application. Pretrial Statement p. 9, ¶ 4 and Exhibit 24.

46. On August 8, 2003, IHS received a request for a waiver application from Simone, in which he indicated that it "would cause an extreme hardship" to either complete his service obligation or to repay IHS. Pretrial Statement p. 9, ¶ 5 and Exhibit 25.

---

11. See pp. 8–11 of the Joint Pretrial Statement for facts that Simone questioned only for relevance and materiality. References to the Joint Pretrial Statement for these facts include both the page and the paragraph number.

47. On or around September 3, 2003, Simone submitted a completed application for waiver of his LRP obligation, "based on two considerations: (1) At the time of my separation and to the present time, it is impossible for me to continue to work for Indian Health Service or a Tribal agency, (2) Health considerations." Pretrial Statement p. 9, ¶ 6 and Exhibit 26.

48. In his application for waiver, Simone included a tax return reflecting annual wages of $64,107 in 2002. Pretrial Statement p. 9, ¶ 7 and Exhibit 26.

49. IHS considered Simone's application for waiver, pursuant to 25 U.S.C. § 1616a(m), which authorizes the Secretary to waive an obligation whenever: (1) "compliance is impossible or would involve extreme hardship to the individual and if enforcement of such obligation with respect to any individual would be unconscionable;" or (2) "in any case of extreme hardship or other good cause shown, as determined by the Secretary." Pretrial Statement p. 9, ¶ 8 and Exhibit 16.

50. In its decision letter dated March 15, 2004, IHS notified Simone that it considered several factors, including his "present financial resources and obligations; ... estimated future financial resources and obligations; and [t]he extent to which [he] has problems of a personal nature." Pretrial Statement p. 10, ¶ 9 and Exhibit 27.

51. In the March 15, 2004 letter, IHS concluded that Simone did not qualify for waiver under the statute because his salary exceeded $60,000 and he had no physical disability that prevented him from working. Pretrial Statement p. 10, ¶ 10 and Exhibit 27.

52. The March 2004 letter further instructed Simone to contact the Program Support Center, Debt Management Branch to make payment arrangements. Pretrial Statement p. 10, ¶ 11 and Exhibit 27.

53. On August 11, 2004, the Debt Management Branch of the Program Support Center notified Simone of the repayment requirements for his debt, which totaled $104,358.94 at the time. Pretrial Statement p. 10, ¶ 12 and Exhibit 28.

54. Due to the continuing accrual of interest, the amount owed as of May 1, 2007, was $124,462.92. Decl. of Barry Blum, ¶ 9.

55. This includes a principal amount of $57,173.42, based on the statutory formula that incorporates the damages amount and gives credit for the amount of time served with IHS. Decl. of Barry Blum, ¶ 9.

56. In addition, interest in the amount of $67,289.50 had accrued through May 1, 2007. Decl. of Barry Blum, ¶ 9.

57. Interest will continue to accrue at a specified rate (currently 13.375%) until the date of judgment, at which time the post-judgment rate (4.94% on April 6, 2007) will apply. Decl. of Barry Blum ¶ 9.

### IV. *Bankruptcy Proceedings*

58. Simone filed for bankruptcy in October 2005. Pretrial Statement ¶ 34.[12]

59. This Court ordered a discharge on February 9, 2006. Pretrial Statement ¶ 35.

60. On June 9, 2006, the Court ordered the bankruptcy case reopened. Pretrial Statement ¶ 37.

### V. *Simone's Current Financial Status*

61. Simone is currently 53 years old and single with no legal dependants. Simone Deposition p. 84 and Depo. Exhibit 5.

---

**12.** This Court takes judicial notice of the contents of this case, number 05–94720.

62. He is currently in good health. Simone Deposition 117–18.

63. Simone has several educational degrees, including: an Associate in Applied Sciences in Alcohol/Substance Abuse Counseling, a Bachelor of Arts, a Master of Arts in Family Counseling, and a Doctor of Psychology. Exhibit 4.

64. On April 12, 2007, Simone had a balance of $7,748.92 in his savings account. Simone Deposition 32–33.

### A. *Annual Income for 2007*

65. Simone's annual income for 2007 will be more than $100,000. Simone Deposition 49–50 and 62–63.

66. This includes Simone's gross, biweekly salary of $3,107.38 ($80,791.88 annually) from his full-time position as the Director of Substance Abuse Services at the Resolve Center of the Riverside Medical Center in Manteno, Illinois. Simone Deposition 62–63.

67. Deductions from his biweekly check include $308 for retirement. Simone Deposition 63.

68. In addition, as part of his private psychology practice, Simone earns approximately $28,500 annually from Kankakee County for counseling work with sex offenders. Simone Deposition 49–50.

69. This source of income accounts for the majority of the $29,775 he reported as self-employment earnings in 2006. Simone Deposition 49–50.

70. In his private psychology practice, he also conducts group counseling sessions, which are attended by 9 to 11 persons, and his weekly income from the group varies from $35 to $110. Simone Deposition 23–25.

71. Simone also receives payments, totaling approximately $50 per week, from three independent contractors who provide group therapy sessions in a building he recently purchased for his private practice. Simone Deposition 22–23.

72. Simone's 2007 income represents an increase over the gross income he reported on his Federal income tax return for 2006, which included a total income of $97,790 that consisted of $67,929 from his full-time position at Riverside Medical Center, $29,775 in self-employment income, $47 in interest, and $39 of taxable refunds. Simone Deposition 46–48 and Depo. Exhibit 3.

### B. *Newly Acquired Property*

73. Simone purchased a new commercial property, located at 1357 West Station Street, Kankakee, Illinois, in May 2006. Simone Deposition 9–10, 13, 18–38.

74. The property includes a two-story brick building with a residential unit in the basement and an additional building in the back. Simone Deposition 19–20.

75. Simone furnished the residential unit for use by his adult daughter, her boyfriend, and her children, who live in the apartment without making any rental or other payments. Simone Deposition 20, 29–30, 42.

76. Simone stated that he purchased the property both to provide his adult daughter a place to live and to conduct his private psychology practice. Simone Deposition 29.

77. For the five to six years prior to purchasing the building, Simone conducted his private practice in rented office space that cost him $500 per month, including utilities. Simone Deposition 27.

78. Simone admits that a private room and locking filing cabinet are sufficient for his private psychology practice, Simone Deposition 50–51, all of which was available in the facility he rented for $500 a month. Simone Deposition 27–29, 51.

79. Despite that, he purchased the new commercial property, at a total monthly cost of $1,855.65, including: mortgage payment ($904.65), taxes ($300), insurance and utilities ($410), and a home equity loan on his residence that he used as the down payment on the commercial property ($241). Pretrial Statement p. 10, ¶ 16 and Simone Deposition 9–10.

80. The only additional income that resulted from the purchase of this property is the payments Simone receives from the independent contractors who use the new commercial building, which payments total approximately $50 per week. Simone Deposition 22–23.

81. The total purchase price for the new property, paid at the closing on May 12, 2006, was $125,500. Simone Deposition 9–10, 13, 38.

82. This amount included the mortgage loan for $110,500 and Simone's down payment of $15,000, which he financed with a home equity loan on his residence. Simone Deposition 9–10, 13, 38.

83. The current outstanding balance on the property's mortgage, as of April 12, 2007, is $107,905.48. Simone Deposition 37.

84. The current outstanding balance of the home equity loan that Simone used to finance his down payment is $4,950.70. Simone Deposition 15.

85. Thus, between June 2006 and March 2007, Simone has reduced the original balance of his home equity loan from $15,000 to $4,950.70. Simone Deposition 12–17.

### C. *Residential Property*

86. Simone also owns a residence, located at 1290 West Bourbonnais, Kankakee, Illinois, which he originally purchased in November 2001 and refinanced in April 2003 for $111,100. Simone Deposition 40.

87. He values the property at $115,000. Simone Deposition 39.

88. The current mortgage balance on this residential property, as of April 12, 2007, is $78,164.17. Simone Deposition 40.

### D. *2005–2006 Federal Income Tax Deductions*

89. On his 2006 Federal income tax return, Simone reported charitable deductions of $7,128. Simone Deposition 66, 85–86 and Deposition Exhibit 3.

90. This amount included $5,678 in personal expenses that he incurred to participate in an international footrace in Chile, South America, that was used to raise money for a charitable organization in Kankakee, Illinois. Simone Deposition 66–73.

91. Simone anticipates spending approximately the same amount to participate in the same type of race in 2007. Simone Deposition 72–73.

92. In 2005, Simone claimed $7,225 in travel expenses for optional trips to Lithuania that were not required by his employer and for which he received no compensation. Simone Deposition 91–92.

### E. *Department of Education Loans*

93. Simone's payment on his DOE educational loans are currently in deferment, which began in November 2006 and will continue until October 2007. Simone Deposition 52–53, 56–59.

94. Under the existing deferment program, Simone is eligible for three annual deferments, and therefore, will be able to renew his deferment in October 2007. Simone Deposition 56–59.

95. Interest continues to accrue on the unsubsidized portion of his DOE loans, and although Simone is not required to pay the interest while his loan is in deferment, he

claims that he paid approximately $3,848 in interest in 2006 and $1,764 thus far in 2007. Simone Deposition 52–53, 58–61.

### STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue as to any material fact, and therefore, the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Bankr.Rules 7056, 9014; *Johnson v. Ford Motor Credit Co. (In re Johnson)*, 53 B.R. 919, 924 (Bankr. D.Ill.1985) (relying on *In re Manchester Lakes Associates*, 47 B.R. 798, 800 (Bankr. E.D.Va.1985)). The moving party has the burden of establishing that there is no genuine issue of material fact. *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.1983). Although any reasonable doubt regarding the existence of disputed facts should be resolved in favor of the party opposing the motion, *Fitzsimmons v. Best*, 528 F.2d 692, 694 (7th Cir.1976), "[a] dispute on a collateral fact will not forestall judgment." *Ohning v. Schneider Nat'l Transcontinental, Inc. (In re Ohning)*, 57 B.R. 714, 715–16 (Bankr.D.Ind.1986). Thus, "[t]o prevent the entry of a summary judgment there must be a legitimate, bona fide dispute as to a fact which affects the relative rights and obligations of the parties." *Ohning*, 57 B.R. at 715–16. As previously discussed, the parties agree that there is no dispute as to any material fact in this case.

I. *Due to Simone's Failure To Fulfill His Obligations Under The LRP Contract, Simone Owes The United States $127,291.24 Under The Statutory Repayment Obligation That Was Incorporated Into His LRP Contract*

 Simone owes a debt to the United States, pursuant to the statutory repayment obligation of 25 U.S.C. § 1616a(*l*), which was incorporated into his LRP contract. Exhibit 14 Sect. F(2). The United States is entitled to judgment as a matter of law. Simone owes this debt since, and he has presented no factual or legal basis for this Court to overlook Simone's statutory and contractual obligation. Although Simone alleges that repayment is "unconscionable," the issue of unconscionability pertains to the question of discharge, 25 U.S.C. § 1616a(m)(4), and not to the existence of the debt. Simone's repayment obligation is required under both his LRP contract and 25 U.S.C. § 1616a(*l*).

A. *Simone Signed A Contract With The LRP, Promising To Serve Two Years With IHS, To Use The Money He Received To Repay His Educational Loans, and To Repay The United States If He Breached His Obligations Under The Contract*

Simone and the IHS Loan Repayment Program agreed to undertake certain obligations, as signified by their signatures to the LRP contract in 1998. IHS promised to issue payments totaling up to $78,600 to or on behalf of Simone, including loan repayments and tax liability payments for each year Simone served with IHS. Pretrial Statement ¶ 18 and Exhibit 14 Sect. A & P. 4. In exchange, Simone promised to serve two years at a site in Wakpala, South Dakota, and to use the money he received to repay his educational loans. Pretrial Statement ¶ 20 and Exhibit 14 Sect. B(1)-(2) & P. 4. In the contract, the parties also defined breach of the contract and set forth the results of breach. Pretrial Statement ¶¶ 21–22 and Exhibit 14 Sect. F. Thus, Simone agreed that, if he failed to fulfill his obligations under the contract *for any reason*, he would be required to pay the Secretary according to the statutory formula. Pretrial Statement ¶¶ 21–22 and Exhibit 14 Sect. F(2).

**B.** *Simone Breached His Obligation Under The Loan Repayment Program Contract, and Therefore, He Owes The United States A Debt Imposed By His Contract and 25 U.S.C. § 1616a(l)*

Simone admits that he breached two of his contractual obligations. First, Simone breached his LRP contract by working only one year of his two-year service obligation. Pretrial Statement ¶¶ 20, 33, Exhibit 14 Sects. B(2), F(2), P.4, and Exhibit 29. His period of service under the LRP contract began on March 9, 1998, the date the contract was signed by the Secretary's authorized representative. Exhibit 14 Sect. C & P. 4. His final date of employment with IHS was March 20, 1999. Pretrial Statement ¶ 33 and p. 8, ¶ 1. Thus, Simone served only 376 days under his LRP contract, from March 9, 1998, until March 20, 1999. Pretrial Statement ¶ 33. Second, Simone also breached his LRP contract by using the LRP money he received for something other than repayment of his educational loans. Pretrial Statement ¶¶ 20, 37, Exhibit 14 Sects. B(1), F(1)(a)(4), and Simone Deposition pp. 105–06.

**1.** *Simone Breached His LRP Contract By Failing to Fulfill His Two–Year Service Obligation*

▉ Simone has not contested the fact that he failed to complete his two-year period of service, as required under his LRP contract and the statute. Any excuse he attempts to provide for his breach is irrelevant, since the LRP agreement and the statute impose the repayment obligation on a participant who fails to complete his service "for any reason:"

> If, *for any reason* ..., an applicant breaches his/her written contract by failing either to begin, or complete, the participant's period of obligated service in accordance with Section 108(f) [codified at 25 U.S.C. § 1616a(f)], the United States shall be entitled to recover from the participant....

Exhibit 14 Sect. F(2) (italics added). *See also* 25 U.S.C. § 1616a(*l*). A similar repayment provision, 42 U.S.C. § 254*o* (b)(1), has been ruled to be "indifferent as to the reason why an individual fails to begin performing his service obligation...." *United States v. Gross*, 725 F.Supp. 892, 894 (W.D.La.1989).[13] As a result, once a participant in the program is placed in default of his contract for failure to complete his service obligation, "the service option terminates and the recipient must repay the debt financially." *Gross*, 725 F.Supp. at 894–95 (relying on *United States v. Redovan*, 656 F.Supp. 121, 126 (E.D.Pa.1986), and *United States v. Martin*, 710 F.Supp. 271 (C.D.Cal.1989)).

Despite the language of his LRP contract and the statute, which both impose the repayment obligation on a participant who breaches *for any reason*, Simone believes he should be excepted from the repayment obligation because he claims it is

---

**13.** Although the courts have yet to interpret many of the provisions that govern the IHS Loan Repayment Program, including § 1616a(*l*), courts have interpreted the often identical provisions of the scholarship and loan repayment programs of the National Health Service Corps ("NHSC"), codified at 42 U.S.C. §§ 254*l*–254t. The NHSC programs have a repayment obligation that is almost identical to that of the IHS Loan Repayment Program:

> [I]f an individual breaches his written contract by failing (*for any reason* ...) to begin such individual's service obligation ..., to complete such service obligation, or to complete a required residency ..., the United States shall be entitled to recover from the individual....

42 U.S.C. § 254*o* (b)(1)(A).

not his fault that he cannot complete his service. Simone seems to allege that it is the fault of IHS that he is unable to fulfill the obligation, since he has been deemed unsuitable for employment with the Agency and would have a difficult time obtaining a qualifying position that would fulfill his obligation under the LRP contract. Although the United States agrees that Simone's criminal background may make fulfillment of his service obligation difficult, if not impossible, the Government also asserts that Simone is the only party that could have prevented his breach. Regardless, both the LRP contract and the statute impose the repayment obligation as a result of any breach.

Simone's breach occurred when he tendered his resignation on February 17, 1999. Pretrial Statement ¶ 31 and Exhibit 21. Even prior to that, however, Simone created the circumstances for his breach when he failed to disclose his criminal background on his employment application forms. Whether he failed to remember his criminal past, lacked comprehension of its relevance, or intended to withhold the information, Simone's non-disclosure of his criminal history placed him and IHS in a position that led to his resignation on February 17, 1999.

Once IHS received his background investigation from OPM, Simone's nondisclosure left IHS facing the mandate of the Indian Child Protection and Family Violence Prevention Act. As discussed above, the Act prohibits employment of certain individuals in positions that have regular contact with or control over Indian children. The prohibition is not punitive, but rather, serves the Act's purposes "to prevent child abuse and protect Indian children." *Johnson v. HHS*, 18 Fed.Appx. 837, 842 (Fed.Cir.2001). To accomplish that purpose, Congress presumed the existence of a nexus between the minimum standards of character established by the Act and the goal of preventing incidents of abuse by Federal employees. *Johnson et al. v. Dep't of Health and Human Serv.*, 86 M.S.P.R. 501, slip op. at 2, 16 (2000) (Final Decision). Thus, the Act sets forth "a bright line rule that anyone who has been convicted of an enumerated crime may not serve in a covered position." *Delong v. Dep't of Health and Human Servs.*, 264 F.3d 1334, 1343 (Fed.Cir.2001). *See also, Daugherty v. Thompson*, 322 F.3d 1249, 1255 (10th Cir.2003). "[G]iven the difficulty of identifying employees who pose a threat to Indian children, the choice of a blanket rule is justified in this case." *Delong*, 264 F.3d at 1343 (upholding the removal of an IHS employee who had one conviction from twenty-five years earlier and had served IHS for ten years without incident).

Simone's suitability under this provision was a condition for both his participation in the LRP, 25 U.S.C. § 1616a(b)(2), and for his federal employment as a psychologist at AAYRTC, 25 U.S.C. § 3207(a)(1) (1994 & Suppl. IV 1999), which is a residential treatment center for Indian youth ages 13–17. Decl. of Tom Eaglestaff ¶ 2. It is uncontested that Simone's position as the Supervisory Clinical Psychologist at the facility was one that involved "regular contact with, or control over, Indian children," as defined in 25 U.S.C. § 3207(a)(1) (1994 & Suppl. IV 1999). Therefore, due to Simone's criminal background, which includes convictions of or pleas to aggravated assault, drug trafficking, and patronizing a prostitute (Exhibits 17, 26, and 35, and Simone Deposition pp. 129–130), the Indian Child Protection and Family Violence Prevention Act prohibited Simone's continued employment with IHS at AAYRTC.

Simone had experience with the removal process under the Act, since he had previ-

ously removed unsuitable individuals under his supervision. Simone Deposition p. 119. Based on this knowledge, Simone chose to resign from his position rather than proceed through the removal process, which includes the opportunity for appeal through IHS, HHS, the Merit Systems Protection Board, and even Federal court. Decl. of David Azure ¶ 15. Simone was also aware that many, if not most, IHS facilities and clinical positions require that the clinicians necessarily treat both adults and Indian children. Exhibit 26 p. 2. Therefore, he knew it would be difficult to identify a qualifying clinical position in which he could fulfill his LRP service obligation.

These circumstances do not excuse Simone from the repayment obligation under the LRP contract and 25 U.S.C. § 1616a(*l*). The statute requires repayment when a participant fails to fulfill his service obligation *for any reason.* Simone's actions, and not any action of IHS, subject him to this requirement. Simone's behavior—including his agreement to the terms of the statute when he signed the LRP contract, his acceptance of the loan repayment money, his failure to disclose his background, for whatever reason, and his resignation—is the sole reason he is now subject to the repayment obligation imposed under 25 U.S.C. § 1616a(*l*).

Simone's objections to the repayment obligation are unsupported in law. "[A]ll courts that have considered the issue of whether the damages provision [codified at 42 U.S.C. § 254o (b)(1)(A)] is a penalty or unconscionable have rejected those contentions and found the provision enforceable." *United States v. Hugelmeyer,* 774 F.Supp. 559, 562 (D.Ariz.1991). *See also, United States v. Fowler,* 659 F.Supp. 624 (N.D.Cal.1987) ("section 254o (b)(1) is an enforceable liquidated damages clause"), aff'd, 849 F.2d 1476 (9th Cir.1988). Thus,

the courts have upheld the contracts and statutory provisions as "valid and enforceable," *Milwaukee Area Joint Apprenticeship Training Comm. v. Howell,* 67 F.3d 1333, 1339 n. 5 (7th Cir.1995), and imposed the repayment requirement. *See, e.g. United States v. Day,* 1996 WL 221180, *5, 1996 U.S. Dist. LEXIS 7004, *13 (E.D.La. 1996) ("[t]he many courts that have addressed Section 254o (b)(1) have held that the provision is not a penalty or treble damages and that it is a valid enforceable liquidated damages clause"); *United States v. Dillingham (In re Dillingham),* 104 B.R. 505 (Bankr.D.Ga.1989); *United States v. Padavano,* 664 F.Supp. 28, 30 (D.Me.1987) ("the triple pay-back provision ... is a valid liquidated damages clause rather than an unenforceable penalty"); *United States v. Turner,* 660 F.Supp. 1323 (E.D.N.Y.1987); *Redovan,* 656 F.Supp. 121; *United States v. Haithco,* 644 F.Supp. 63 (W.D.Mich.1986); *United States v. Hayes,* 633 F.Supp. 1183 (M.D.N.C.1986); *and United States v. Swanson,* 618 F.Supp. 1231 (D.Mich.1985).

■ The courts have relied on the principle that the relationship between a program participant and the United States "does not arise from a negotiated agreement, but is provided for by statute." *United States v. Becker,* 995 F.2d 779, 783 (7th Cir.1993) (relying on *Rendleman v. Bowen,* 860 F.2d 1537, 1541–44 (9th Cir. 1988)). As a result, "statutory intent is more relevant to interpret [an agreement's] conditions than common-law contract principles." *Becker,* 995 F.2d at 783 (relying on *Rendleman,* 860 F.2d at 1541–44). *See also, United States v. Arron,* 954 F.2d 249, 251 (5th Cir.1992); *United States v. Melendez,* 944 F.2d 216, 219 (5th Cir. 1991) ("conditions imposed upon an NHSC scholarship recipient arise from statutory directives, not from a negotiated agreement between the parties"); *Hugelmeyer,*

774 F.Supp. at 561 ("statutory intent, rather than general contract principles govern the interpretation of the relationship between the Secretary of Health and Human Services and the scholarship recipient"); *United States v. Nayden*, 1990 WL 93685, *5, 1990 U.S. Dist. LEXIS 8134, *16 (N.D.Ind.1990) ("contract defenses are not valid since the rights and duties of the parties are governed by statute, and not common law contract principles," relying on *Rendleman*, 860 F.2d at 1541-42); and *Rendleman*, 860 F.2d at 1542 ("the plain language of the statute demonstrates that Congress did not intend that contract principles govern the interpretation of the relationship between the Secretary and a scholarship recipient").

 In upholding the repayment provisions, the courts have emphasized Congress' purpose for creating the programs. For example, the purpose of the NHSC program is to encourage health care providers "to set up practice in areas that have traditionally been deprived of access to adequate medical services," and not merely to finance a student's education. *United States v. Duffy*, 879 F.2d 192, 198 (6th Cir.1989). Similarly, the IHS Loan Repayment Program is intended to "assure an adequate supply of trained health professionals necessary to ... provide health care services to Indians." *See* 25 U.S.C. § 1616a(a)(1). When considering these purposes, it becomes clear that "the service obligation was intended to be one not easily avoided." *Melendez*, 944 F.2d at 219 (relying on *Rendleman*, 860 F.2d at 1541). Therefore, the courts have upheld the full statutory repayment amount, explaining that Congress may have even intended to impose an excessive penalty for breach by a participant in order to discourage breach and ensure fulfillment of the program's purpose of bringing quality care in under-served areas and to

under-served populations. *See, e.g., Duffy,* 879 F.2d at 198.

Even when the Government may have contributed to the debtor's default, the courts have upheld the repayment obligation. Such claims have been "rejected as not material." *United States v. Williams,* 864 F.Supp. 305, 312 (E.D.N.Y. 1994). As a result, courts have upheld the repayment obligation against a dentist who was terminated after negative performance appraisals, *United States v. Noel,* Adversary No. 89-00176A, Case No. 689-00451 (Bankr.W.D.Va., May 16, 1990), and a scholarship recipient who claimed she was unable to perform due to the agency's failure to place her in a suitable facility, *Williams,* 864 F.Supp. 305.

The case law has upheld the application of statutory repayment provisions. In doing so, the courts have rejected allegations of the unconscionability of such provisions, refused to apply contract defenses, and considered allegations of Government misconduct to be immaterial. Simone has presented no factual or legal challenge to override his contract, the statute, and the findings of these courts. Therefore, he owes a debt to the United States for the statutory repayment obligation incorporated into his LRP contract.

2. *Simone Breached His LRP Contract By Misusing The Money and Not Using It To Repay His Educational Loans*

 Simone also breached his LRP contract by using the LRP money he received for something other than repayment of his educational loans. Pretrial Statement ¶ 37 and Simone Deposition pp. 105-06. The LRP gives awards for "the principal, interest, and related expenses on government and commercial loans received by the individual regarding the undergraduate or graduation education of the indi-

vidual," including tuition expenses and other "reasonable educational expenses." 25 U.S.C. § 1616a(g)(1). Simone agreed "[t]o accept loan repayments" from the Secretary and "to apply such payments only to outstanding eligible health professions educational loans." Exhibit 14, page 2. Despite both the statutory and contractual provisions that require application of the money to his educational loans, Simone readily admits that he did not apply the $30,000 he received toward his educational loans. Pretrial Statement ¶ 37 and Simone Deposition 105–06. This is a separate violation of his LRP contract and the statute, and therefore, a second breach.

For these reasons, judgment is hereby entered in favor of the United States against Simone, declaring that he owes the United States under the statutory repayment obligation, in the amount of $127,291.24, plus post-judgment interest.

II. *Simone's IHS Debt Should Not Be Discharged In Bankruptcy Because He Cannot Satisfy The Unconscionability Standard Required For Discharge Under 25 U.S.C. § 1616a(m)(4)*

The Court also hereby refuses to discharge this debt in bankruptcy because Simone has alleged no facts that meet the unconscionability standard required under 25 U.S.C. § 1616a(m)(4) for discharge of the repayment obligation. In fact, in preparing the Joint Pretrial Statement, Simone did not contest any facts proposed

by the Government, but only disputed the relevance and materiality of certain facts— the facts that pertain to his ability to repay the debt. As discussed above, those objections are overruled. Simone has not asserted an inability to repay. Summary judgment also is granted in favor of the United States, denying discharge, since the debtor has provided no evidence and made no effort to show how nondischarge of the debt incurred from his LRP obligation would be unconscionable, as required for discharge of the obligation under 25 U.S.C. § 1616a(m)(4).

A. *Simone Cannot Meet the Standard of Unconscionability for Discharge, Which Requires Him To Prove That Nondischarge of The IHS Debt Would Be "Excessive, Exorbitant," "Lying Outside the Limits of What Is Reasonable or Acceptable," "Shockingly Unfair, Harsh, or Unjust," or "Outrageous"*

The standard for discharge of Simone's repayment obligation is governed by the unconscionability standard of 25 U.S.C. § 1616a(m)(4) rather than the Bankruptcy Code. 25 U.S.C. § 1616a(m)(4), *United States v. Green (In re Green)*, 82 B.R. 955, 957 (Bankr.N.D.Ill. 1988) ("The law in this Circuit is unequivocally clear. The dischargeability in bankruptcy of HEAL loans is governed by 42 U.S.C. § 294f(g) rather than by any provision of the Bankruptcy Code") [14] (relying

14. As explained in note 12, the courts have yet to interpret many of the provisions that govern the IHS Loan Repayment Program. However, the courts have considered the similar bankruptcy discharge provision that governs the Health Education Assistance Loans ("HEAL") program, currently codified at 42 U.S.C. §§ 292–292p. Prior to 1992, the HEAL program was codified at 42 U.S.C. §§ 294–294*l*–1. *See* 102 Public Law 408.

The HEAL program, as well as the NHSC program discussed above, both have provisions comparable to the LRP discharge standard contained in § 1616a(m)(4). The HEAL discharge provision states:

Notwithstanding any other provision of Federal or State law, a debt that is a loan insured under the authority of this subpart may be released by a discharge in bankruptcy under any chapter of title 11, only if such discharge is granted—... (2) upon a

on *In re Johnson,* 787 F.2d 1179 (7th Cir.1986)). *See also, United States v. Wood,* 925 F.2d 1580, 1582 (7th Cir.1991) ("The dischargeability of a HEAL loan is governed by 42 U.S.C. § 294f(g)"); *and Hines v. United States (In re Hines),* 63 B.R. 731, 734 (Bankr.D.S.D.1986) ("the Court holds 42 U.S.C. § 294f(g), and not 11 U.S.C. § 523(a)(8), is paramount for determining HEAL student loan dischargeability"). Therefore, Simone bears the burden of proving to this Court that nondischarge of his debt would be unconscionable. *Rice v. United States,* 78 F.3d 1144, 1149 (6th Cir.1996) (finding that the debtor bears the burden of proving unconscionability in his claim for discharge).

▬▬▬ The unconscionability standard is a high standard that is "significantly more burdensome than the 'undue hardship' standard used to discharge educational loans." *Ascue v. U.S. (In re Ascue),* 268 B.R. 739, 744 (Bankr.W.D.Va.2001). *See also, In re Woody,* 494 F.3d 939, 949–50 (10th Cir.2007) [15] ("a court may not utilize its discretion to overcome Congress's requirement that debtors seeking discharge of HEAL loans meet a strict unconscionability standard. 'Given the extreme nature of Congress' chosen standard for the discharge of HEAL loans, we believe that in all but the most difficult cases the question of whether the debtor has satisfied that standard will be obvious,'" relying on *Rice,* 78 F.3d at 1148–50); *Wood,* 925 F.2d at 1582–1583 (7th Cir.1991) ("the requirements of section 294f(g) are more stringent than those" required for undue hard-

ship); *United States v. Rice,* 182 B.R. 759, 761 (N.D.Ohio 1994) ("unconscionability poses a significantly more burdensome standard than the 'undue hardship' standard"); *Green,* 82 B.R. at 959; *and Hines,* 63 B.R. at 736 ("unconscionable under Section 294f(g)(2) requires a higher standard than a finding of undue hardship"). The standard of unconscionability applies the ordinary usage of the term, which is " 'excessive, exorbitant,' 'lying outside the limits of what is reasonable or acceptable,' 'shockingly unfair, harsh, or unjust,' or 'outrageous.' " *Matthews v. Pineo,* 19 F.3d 121, 124 (3rd Cir.1994) (citing Webster's Third New International Dictionary 2486 (1977)). *See also, Rice,* 78 F.3d at 1148–49. Due to the high standard, a finding of unconscionability will be rare. *Rice,* 78 F.3d at 1150; *and United States v. Smitley,* 347 F.3d 109, 118 (4th Cir. 2003).

▬▬ In determining whether Simone has met his burden of showing that nondischarge of his repayment obligation would be unconscionable, the Court "evaluat[es] the totality of the facts and circumstances." *Ascue,* 268 B.R. at 744; *and In re Woody,* 494 F.3d 939, 948–50. The Court's evaluation includes "objective factors" such as Simone's: 1) educational background, 2) professional degree, 3) income, 4) earning ability, 5) health, 6) accumulated wealth, 7) dependants, and 8) age. *Ascue,* 268 B.R. at 744–45; *and Rice,* 78 F.3d at 1149. Another important factor is Simone's "past efforts to repay the loan, including . . . the debtor's acquisition of

finding by the Bankruptcy Court that the nondischarge of such debt would be unconscionable. . . .

42 U.S.C. § 292f(g)(2). The NHSC discharge provision states:

Any obligation of an individual under the Scholarship Program (or a contract thereunder) or the Loan Repayment Program (or a contract thereunder) for payment of damages may be released by a discharge in bankruptcy under title 11 . . . only if the

bankruptcy court finds that nondischarge of the obligation would be unconscionable.

42 U.S.C. § 254*o* (d)(3)(A).

**15.** On September 13, 2007, this Court allowed the United States' motion to cite *In re Woody,* 494 F.3d 939 (10th Cir.2007), a subsequently decided case, as additional authority for its Motion for Summary Judgment. Docket Entry ## 74 and 72.

new financial burdens contemporaneous with the [ ] debt." *Ascue*, 268 B.R. at 744–45. *See also, In re Woody*, 494 F.3d at 954–55 (concluding that the debtor's failure to make at least minimal payments shows a lack of good faith and that "a debtor's good faith efforts at repayment over the life of his loans are an important part of an unconscionability analysis"); *Clark v. United States Dep't of Educ. (In re Clark)*, 341 B.R. 238, 255–56 (Bankr.D.Ill.2006) (discussing a good faith effort to pay as a condition for meeting even the undue hardship standard for discharge); *and Rice*, 78 F.3d at 1150 ("we believe the debtor's good faith to be an appropriate and necessary consideration," based on the requirement that "the debtor show he has made good faith efforts to repay the loans") (relying on *Brunner v. New York State Higher Educ. Serv. Corp.*, 831 F.2d 395, 396 (2d Cir.1987), which required a showing of good faith even for the lower discharge standard of undue hardship). Courts have also considered the size of the debt, the rate at which interest is accruing, and the extent to which the debtor's circumstances are likely to continue or improve. *Ascue*, 268 B.R. at 744–45; *and Rice*, 78 F.3d at 1149. Finally, the courts have "ascertain[ed] whether the debtor has attempted to minimize the expenses of himself and his dependents" and "to maximize his income." *Rice*, 78 F.3d at 1149–50. *See also, Brunner*, 831 F.2d at 396 (holding that even the lower undue hardship standard requires the debtor to show that he cannot maintain a "minimal" standard of living if forced to repay the loans); *and Matthews*, 19 F.3d at 124.

**B.** *The Evidence Shows That Nondischarge of Simone's Repayment Obligation To The United States Would Not Be Unconscionable Under § 1616a(m)(4)*

■ Simone has failed to prove any facts that support a finding that nondischarge of his debt to the United States would be unconscionable. He has not even alleged an inability to repay the obligation. A review of the factors laid out by the courts show that such allegations, if made, are unsupported by Simone's current financial situation. The totality of his circumstances show that Simone is financially able to repay this debt. In fact, even with his current expenditures, Simone has the financial ability to pay $474.84 per month toward his repayment obligation to the United States. Decl. of Barry Blum ¶ 10. By reducing his discretionary spending, Simone could afford to repay his obligation according to the amortized repayment options for either 15 years ($1,007.20 per month) or 20 years ($817.28 per month). Decl. of Barry Blum ¶ 12.

**1.** *Objective Factors: Educational Background, Professional Degree, Income, Earning Ability, Health, Accumulated Wealth, Dependants, and Age*

The objective factors considered by the courts show that nondischarge of Simone's debt would not be unconscionable. Simone is highly educated with multiple degrees, including a Doctor of Psychology. Exhibit 4. He is currently practicing in his professional field as a psychologist. Simone Deposition 23–25, 49–50, 62–63. He will earn a combined salary of more than $100,000 in 2007. Simone Deposition 49–50 and 62–63. He does not suffer from any health problems that would interfere with his ability to repay his obligation. Simone Deposition 117–18. In addition, Simone owns two properties: 1) his residence, which he values at $115,000 and for which his mortgage balance is $78,164.17 (Simone Deposition 39–40), and 2) a commercial property, which he purchased for $125,500 in May 2006 and for which he currently owes

$112,856.18 including $4,950.70 on the home equity loan on his residence. Simone Deposition 9–10, 13, 18–38. He also has $7,748.92 in his savings account. Simone Deposition 32–33. Finally, Simone is only 53 years old, and therefore, he has sufficient time with which to repay the debt. Simone Deposition 84. None of these objective factors show that nondischarge would be unconscionable.

### 2. Past Efforts to Repay the Debt, Including Acquisition of New Financial Burdens

Simone's attorney acknowledged during his oral argument on September 13, 2007, that Simone has never made a payment toward his repayment obligation. This failure to even attempt repayment suggests an unwillingness, rather than inability, to do so. This conclusion is supported by Simone's actions since this Court granted his general bankruptcy discharge on February 9, 2006. In May 2006, three months after this Court granted Simone's general bankruptcy discharge, Simone purchased a new commercial property, at a total monthly cost of $1,855.65. Pretrial Statement p. 10, ¶ 16 and Simone Deposition 9–10. Although Simone uses this building for his private psychology practice, as well as to provide an apartment for his adult daughter, he was able to conduct his professional practice in a rented space, for only $500 per month, for a period of five to six years. Simone Deposition 27–29, 51. Simone's purchase of this new commercial property since his general bankruptcy discharge has resulted in additional monthly expenses of $1,300 above the amount he was previously paying for the same purpose. Simone Deposition 9–10, 27–29, 50–51; Pretrial Statement p. 10 ¶ 16. This is a "self-imposed and excessive liability" that demonstrates Simone's lack of good faith. *Clark,* 341 B.R. at 255–56 (finding that a self-imposed hardship, in

that case a new automobile, shows bad faith even under the lower undue hardship standard for discharge of a debt).

Based upon the facts and law applicable to this case, Simone cannot justify discharge because he has never acted in good faith to pay his IHS repayment obligation.

### 3. Attempts to Minimize Discretionary Expenses

Simone's expenditures show that he has not attempted to reduce discretionary payments, but rather, has used significant resources for such payments. For example, Simone has had the resources to pay in excess of his minimum monthly mortgage payments in order to pay down his mortgage from $110,000, the amount for which he refinanced it in April 2003, to $79,000 in April 2007. Simone Deposition 39–40. This is a total of $31,000 in payments on the principal in four years. In addition, in the eleven months since he initially purchased the new commercial building in May 2006, Simone has made payments in excess of his minimum monthly payments on the home equity loan on his residential property, which he used as the down-payment for the new commercial property. Simone Deposition 9–10, 13, 18–38. As a result of those excess payments, Simone has reduced the balance on that loan from $15,000 to $4,950.70, a reduction of $10,049.30 in the principal over eleven months. Simone Deposition 9–10, 13, 18–38.

Simone also has significant discretionary expenditures to charity. Simone reported $7,128 in charitable deductions on his 2006 Federal income tax return. Simone Deposition 66, 85–86 and Deposition Exhibit 3. This amount included $5,678 of personal expenses related to participating in an international footrace in Chile, South America, which was used to raise money for a

charitable organization in Kankakee, Illinois. Simone Deposition 66–73. Simone anticipates spending approximately the same amount on the same type of race in 2007. Simone Deposition 72–73. In 2005, Simone also had discretionary travel costs in the amount of $7,225 for optional trips he made to Lithuania, even though he received no compensation for making those trips and the trips were not required by his employer. Simone Deposition 91–92.

As another example of discretionary costs, Simone deducts $308 from his bi-weekly salary for contribution to his retirement plan. Simone Deposition 63. Although retirement savings is desirable, it is neither essential to Simone's well-being nor unconscionable to require Simone temporarily suspend these contributions in order to repay his debt. *See Anes v. Dehart (In re Anes)*, 195 F.3d 177, 180–81 (3rd Cir.1999) ("[v]oluntary contributions to retirement plans are . . . are not reasonably necessary for a debtor's maintenance or support"); *and Harshbarger v. Pees (In re Harshbarger)*, 66 F.3d 775, 777 (6th Cir. 1995). *See also, In re Cornelius*, 195 B.R. 831, 835 (Bankr.N.D.N.Y.1995); *In re Cavanaugh*, 175 B.R. 369, 373 & n. 3 (Bankr.D.Idaho 1994); *In re Fountain*, 142 B.R. 135, 137 (Bankr.E.D.Va.1992); and *In re Festner*, 54 B.R. 532, 533 (Bankr.E.D.N.C.1985).

Simone's elimination or reduction of any or all of these discretionary payments would enable him to minimize his monthly expenses, thereby freeing his income so that he can repay his obligation to the United States more quickly. The availability of such additional funds shows that nondischarge of the IHS repayment obligation would not be unconscionable.

### 4. *Other Factors*

Finally, Simone alleges that he is unable to pay the IHS repayment obligation because of the amount he owes to the United States Department of Education for his educational loans. His assertion of his DOE debt as a bar against paying the LRP repayment obligation is especially problematic because Simone's DOE debt would be much lower had he applied the money he received from the IHS Loan Repayment Program to his educational loans. Simone would have significantly reduced the principal amount owed to DOE if he had used the $30,000 he received from the LRP for its intended purpose. In addition, he would have avoided the interest that has accrued on that $30,000 since June 1998, when Simone received the LRP money from IHS. Furthermore, Simone's DOE educational loans are currently in deferment, and therefore, he is not required to make any payments on these loans. Simone Deposition 52–53, 56–59.

■ Discharge of the IHS repayment obligation in order to accommodate Simone's repayment of his DOE loans would create an odd precedent by allowing a debtor to discharge a debt with a high standard of unconscionability for discharge in order to pay another debt with a lower standard for discharge. Educational loans owed to DOE may be discharged upon a finding that nondischarge would impose an "undue hardship" on the individual. 11 U.S.C. § 523(a)(8). As already discussed, courts have widely held that the unconscionability standard, which must be met to discharge the obligation Simone owes under 25 U.S.C. § 1616a, is significantly higher than that of undue hardship. For these reasons, Simone's DOE loans cannot be used to show that nondischarge of his LRP repayment obligation would be unconscionable.

**IT IS SO ORDERED.**